# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 92 C 1982 | **DATE** | 8/23/2004 |
| **CASE TITLE** | Memisovski, et al. vs. Maram, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, the Court declares that the defendants' policies and practices have violated and are violating the rights of the plaintiffs under 42 U.S.C. § 1396a(a)(30)(A) and the EPSDT provisions. Status hearing is set for 9/14/04 at 9:30 a.m to discuss further proceedings relating to an appropriate injunction to remedy the defendants' violations. Furthermore, the plaintiffs are awarded their costs and reasonable attorneys' fees, the amount of which to be determined upon entry of final judgment in accordance with Local Rule 54.3.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | AUG 2 4 2004 | |
| | Notified counsel by telephone. | date docketed | **390** |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 8/23/2004 | |
| MD | courtroom deputy's initials | date mailed notice | |
| | | MD | |
| | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
2004 AUG 23 PM 7: 13

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KERIM & ADVIJE MEMISOVSKI, by their mother THERESA MEMISOVSKI; LORETTA STURDIVANT; MICHAEL SAMPSON by his mother MICHELLE SAMPSON; and JOSEPH and ADAM HASSAN by their mother MICHELLE HASSAN; all on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | **DOCKETED** AUG 2 4 2004 |
| vs. | ) ) | No. 92 C 1982 Judge Joan H. Lefkow |
| BARRY S. MARAM, Director of the Illinois Department of Public Aid and CAROL L. ADAMS, Secretary of the Illinois Department of Human Services, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This case is a class action brought on behalf of minor children in Cook County, Illinois who are or will be eligible for the Medical Assistance Program ("Medicaid") established under Title XIX of the Social Security Act. The plaintiffs allege, pursuant to 42 U.S.C. § 1983, that defendants are in violation of the federal Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*, by failing to ensure (1) that all plaintiffs have pediatric care and services to the extent that such care and services are available to the general population and (2) that plaintiffs are provided early and periodic screening, diagnostic, and treatment ("EPSDT") services. For the reasons set forth below, and based on the evidence received at trial, the court finds that the defendants have been and are in violation of the requirements of the federal Medicaid Act.

390

# I.    Introduction

"Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder* v. *Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990). State participation in Medicaid is voluntary, but if a state chooses to participate in the program, it must comply with the Medicaid Act and its implementing regulations promulgated by the Secretary of Health and Human Services. *Id.* at 502. To qualify for federal assistance, a state is required to submit to the Secretary an approved "plan for medical assistance," which must contain "a comprehensive statement describing the nature and scope of the State's Medicaid program." *Id.* (citing 42 U.S.C. § 1396a(a) and 42 C.F.R. § 430.10).

On March 23, 1992, plaintiffs filed this action alleging that defendants were in violation of the federal Medicaid Act. The case was assigned to the Honorable James B. Zagel. On October 8, 1992, Judge Zagel certified the following class: "All children (persons under the age of 18) in Cook County, Illinois, who, on or after July 1, 1990, have been, are, or will be eligible for the Medical Assistance Program ("Medicaid") established under Title XIX of the Social Security Act."[1] The case was stayed for many years thereafter and, on July 2, 1999, reassigned to the Honorable William J. Hibbler. From Judge Hibbler, and pursuant to this court's executive order, the case was reassigned to the undersigned on September 5, 2000.

On November 29, 2000, defendants filed a motion to dismiss what was then the plaintiffs' Third Amended Complaint. The defendants argued both that the Eleventh

---

[1] Judge Zagel also certified a separate class of women in Cook County on Medicaid who "have been, are, or will be pregnant." The claims on behalf of this class of pregnant women were voluntarily dismissed on May 29, 2003.

Amendment barred plaintiffs' requested relief and that plaintiffs could not seek redress for any violations of the Medicaid Act under § 1983. That motion was denied by memorandum opinion and order dated October 17, 2001. *See Memisovski* v. *Patla*, No. 92 C 1982, 2001 WL 1249615 (N.D. Ill. Oct. 17, 2001). Defendants' Eleventh Amendment argument was rejected because this action seeks only prospective injunctive relief for violations of the federal Medicaid Act and does not seek compensatory damages. *Id.* at *4-5. Concerning defendants' argument that the plaintiffs could not seek redress for any violations under 42 U.S.C. § 1983, the court cited and applied the three-factor test established by the Supreme Court in *Blessing* v. *Freestone*, 520 U.S. 329, 340 (1997). Citing cases which had allowed causes of action under § 1983 for violation of the same statutory sections at issue in this case, the court rejected defendants' argument, noting that "[d]efendants have provided no reason why this court should reject the analysis set forth in these cases, which hold that violations of the statutory provisions requiring EPSDT services are redressable through § 1983."[2]

After denial of defendants' motion to dismiss, the parties conducted extensive discovery for nearly three years. This case was tried to the court during eleven days from May 3, 2004 to May 25, 2004. Based on the evidence received, including the parties' statement of uncontested facts, the exhibits received in evidence and the testimony of the witnesses, the court has weighed the evidence and the credibility of the witnesses and has made findings of fact and conclusions of law, which are discussed in parts III and IV below. First, however, the court considers, in part II below, defendants' argument for judgment on the pleadings.

---

[2]The court also noted that defendants had failed even to mention the three-factor test at all in their moving papers. *Id.* at *5.

## II.    Judgment on the Pleadings[3]

First in their pre-trial submissions, and again in their post-trial brief, defendants argue

that the issue of whether a statute confers enforceable rights under § 1983 has changed since this

court's memorandum opinion and order on October 17, 2001. Specifically, defendants contend

that the Supreme Court's opinion in *Gonzaga University* v. *Doe*, 536 U.S. 273 (2002), has

changed the legal landscape sufficiently for this court to reconsider whether plaintiffs continue to

have rights enforceable under § 1983. Because, however, this court's previous ruling that

enforceable rights exist under § 1983 is the law of the case, it will not be reconsidered "unless

[the court has] a strong conviction that the earlier ruling was wrong and the party that benefitted

from the earlier ruling would not be unduly harmed." *White* v. *Godinez*, 301 F.3d 796, 804 (7th

Cir. 2002).

The first specific statutory section of the federal Medicaid Act that plaintiffs assert

provides them enforceable rights is located at 42 U.S.C. § 1396a(a)(30)(A), which states in

relevant part as follows:

> A State medical plan for assistance must—
> ***
> (30)(A) provide such methods and procedures relating to the utilization of, and the
> payment for, care and services available under the plan . . . as may be necessary to
> safeguard against unnecessary utilization of such care and services and to assure
> that payments are consistent with efficiency, economy, and quality of care and are
> sufficient to enlist enough providers so that care and services are available under
> the plan at least to the extent that such care and services are available to the
> general population in the geographic area; . . .

The other statutory sections at issue relate to the EPSDT services which are scattered among

---

[3]A motion for judgment on the pleadings is properly granted when there are no material issues of fact and
the moving party is entitled to judgment as a matter of law. *Alexander* v. *City of Chicago*, 994 F.2d 333, 335-36 (7th
Cir. 1993).

several portions of the Medicaid Act, including 42 U.S.C. § 1396a(a)(10) and (43),

§ 1396d(a)(xiii)(4)(B) and (r) (hereinafter collectively referred to as the "EPSDT provisions").

The issue defendants raise after trial is whether, under *Gonzaga*, § 1396a(a)(30)(A) and the

EPSDT provisions provide enforceable rights under 42 U.S.C. § 1983[4] to individuals.

There is no question that § 1983 provides a federal remedy for violations not only of the

United States Constitution but also for federal statutes as well. *Maine* v. *Thiboutot*, 448 U.S. 1, 4

(1980). To have a cause of action under § 1983 for violation of a federal statute, a plaintiff must

first establish that the statute in question gives the plaintiff enforceable rights. *Gonzaga*

*University*, 536 U.S. at 283 (statute must contain "unambiguously conferred right to support a

cause of action brought under § 1983.").

Because the federal Medicaid Act is a spending statute, *see Bruggeman* v. *Blagojevich*,

324 F.3d 906, 911 (7th Cir. 2003), Congress must "speak with a clear voice" and manifest its

"unambiguous" intent to confer individual rights before federal funding provisions will be read to

provide a basis for private enforcement. *Gonzaga University*, 536 U.S. at 1268 (citing *Pennhurst*

*State Sch. & Hosp.* v. *Halderman*, 451 U.S. 1, 17, 28 & n. 21 (1981)). "In legislation enacted

pursuant to the spending power, the typical remedy for state noncompliance with federally

---

[4] 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State
or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the
United States or other person within the jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured
in an action at law, suit in equity, or other proper proceeding for redress, except that in any action
brought against a judicial officer for an act or omission taken in such officer's judicial capacity,
injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief
was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the
District of Columbia shall be considered to be a statute of the District of Columbia.

imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *31 Foster Children* v. *Bush*, 329 F.3d 1255, 1268 (11th Cir. 2003) (citing *Pennhurst*, 451 U.S. at 28)); *see also Bruggeman*, 324 F.3d at 911 (noting that different portion of Title XIX of the Social Security Act "cannot be interpreted to create a private right of action, given the Supreme Court's hostility, most recently and emphatically expressed in *Gonzaga University* v. *Doe*, 536 U.S. 273 (2002), to implying such rights in spending statutes.").

In *Blessing*, the Supreme Court set forth three factors to determine whether a federal statute can be read to confer a right enforceable under § 1983: (1) Congress must have intended that the provisions in question benefit the plaintiff; (2) the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the statute must unambiguously impose a binding obligation on the States imposed in mandatory, rather than precatory, terms. 520 U.S. at 340-41. Following *Blessing*, in *Gonzaga* the Court clarified that, under the first factor above, a plaintiff may bring suit under § 1983 as an intended beneficiary of a statute only if the statute itself unambiguously demonstrates congressional intent to confer an individual or personal right on that plaintiff. *See* 536 U.S. at 283 (rejecting notion that cause of action may be inferred "so long as the plaintiff falls within the general zone of interest that the statute is intended to protect" and noting that it is "*rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983].") (emphasis in original).

In *Gonzaga*, the Court dealt with provisions of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), which prohibits the federal funding of educational institutions that have

a policy or practice of releasing education records to unauthorized persons. The specific portion of the FERPA addressed by the Court provided:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of students without the written consent of their parents to any individual agency, or organization.

20 U.S.C. § 1232g(b)(1). In concluding that this statutory provision was not enforceable under § 1983, the Court noted that the FERPA's nondisclosure provisions "entirely lack the sort of 'rights creating' language critical to showing the requisite congressional intent to create new rights." 536 U.S. at 287.

As a basis for comparison, the Court examined the FERPA's language in light of other statutes where a private right was found, such as Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("*No person* in the United States *shall* . . . be subject to discrimination under any program or activity receiving Federal financial assistance . . . .") (emphasis added) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("*No person* in the United States *shall*, on the basis of sex . . . .") (emphasis added). The Court explained that those statutes are phrased "with an unmistakable focus on the benefitted class." *Gonzaga University,* 536 U.S. at 284 (quoting *Cannon* v. *University of Chicago,* 441 U.S. 677, 691 (1979)). By contrast, the Court characterized the FERPA's language above ("[n]o funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice") as "two steps removed from the interest of individual students and parents and clearly does not confer the sort of 'individual entitlement' that is enforceable under § 1983." *Id; see also Alexander* v. *Sandoval,* 532 U.S. 275, 294 (2001) ("Statutes that focus on the person regulated rather than the individuals

7

protected create 'no implication of an intent to confer rights on a particular class of persons.'")
(quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).

Moreover, the court further noted that the FERPA's nondisclosure provisions "speak only in terms of institutional policy and practice, not individual instances of disclosure." *Gonzaga University*, 536 U.S. at 288 (quoting 20 U.S.C. § 1232g(b)(1)-(2), prohibiting funding of "any educational agency or institution which has a *policy or practice* of permitting the release of education records.") (alteration in original). The FERPA had an "aggregate" focus under which recipient institutions could avoid termination of funding so long as they "comply substantially" with the Act's requirements. *Id.* at 228; *cf. Blessing*, 520 U.S. at 335 (Title IV-D of Social Security Act failed to support a § 1983 suit because it required only "substantial compliance" with federal regulations).

Finally, the Court noted that its conclusion that the FERPA's nondisclosure provisions failed to confer enforceable rights was "buttressed by the mechanism that Congress chose to provide for enforcing those provisions," including that the FERPA allowed the Secretary of Education to "deal with violations" of the Act and design review boards for investigating and adjudicating any violations. *Id.* at 289. The Court noted that these administrative review procedures distinguished the FERPA from other statutory sections previously found to confer rights enforceable under § 1983 and supported the Court's conclusion that there was no congressional intent to create individually enforceable private rights under the FERPA. *Id.*

Bearing in mind the factors to be considered in determining whether a statute confers rights enforceable under § 1983 and considering the Supreme Court's analysis in *Gonzaga*, this court will analyze whether rights are enforceable under the sections of the federal Medicaid Act

relevant to this action. The court notes, however, that because *Gonzaga* modified the three-part *Blessing* analysis only in regard to the first factor, and since *Blessing* was decided prior to this court's decision that rights are enforceable under the statutory sections at issue (and, indeed, the court cited and applied *Blessing* in its October 17, 2001 memorandum opinion and order), here the only issue that needs to be revisited is the first factor. Thus, the issue under consideration is after *Gonzaga*, do 42 U.S.C. § 1396a(a)(30)(A) and the EPSDT provisions unambiguously confer rights on plaintiffs supporting a cause of action brought under § 1983. As will be explained below, the answer is yes.

**A.      42 U.S.C. § 1396a(a)(30)(A)**

The statutory section, 42 U.S.C. § 1396a(a)(30)(A), referred to as the "equal access" provision, requires a state plan to enlist sufficient providers so that care is available "at least to the extent that such care and services are available to the general population in the geographic area; . . . ." Prior to *Gonzaga*, the Seventh Circuit specifically allowed *providers* of medical care to have a private right of action, pursuant to § 1983, to enforce § 1396a(a)(30)(A). *Methodist Hospitals, Inc.* v. *Sullivan*, 91 F.3d 1026, 1029 (7th Cir. 1996). The fact that the Seventh Circuit only dealt with providers of medical care, and not recipients as is the case here, is a distinction of no import. The case on which the Seventh Circuit relied, *Arkansas Medical Soc'y, Inc.* v. *Reynolds*, 6 F.3d 519 (8th Cir. 1993), specifically allowed suit for both providers and recipients. *Id.* at 526 ("The equal access provision is indisputably intended to benefit the recipients by allowing equivalent access to health care services."); *see also Visiting Nurse Ass'n of N. Shore, Inc.* v. *Bullen*, 93 F.3d 997, 1004 (1st Cir. 1996) (allowing suit by both providers and recipients under § 1983 to enforce § 1396a(a)(30)(A)). Indeed, cases disagreeing with the conclusion that

9

medical providers were afforded rights to enforce § 1396a(a)(30)(A) noted that it was recipients, and not providers, who should be afforded such rights. *E.g.*, *Pennsylvania Pharmacists Ass'n* v. *Houstoun*, 283 F.3d 531, 544 (3d Cir. 2002) (en banc) (rejecting providers' right to sue under § 1396a(a)(30)(A) and noting that "recipients have sued to enforce Section 30(A), and the other courts of appeals have uniformly held that recipients may assert such claims under § 1983."); *Evergreen Presbyterian Ministries, Inc.* v. *Hood*, 235 F.3d 908, 927 (5th Cir. 2000) ("We agree with our sister circuits which have held that recipients are the intended beneficiaries of section 30(A).").

This court has found only two decisions after *Gonzaga* considering whether recipients have a right of action under § 1983 to sue for violation of § 1396a(a)(30)(A). Compare *Sanchez* v. *Johnson*, 301 F. Supp. 2d 1060 (N.D. Cal. 2004) (reconsidering issue after *Gonzaga* and rejecting that § 1396a(a)(30)(A) provides rights enforceable under § 1983 to recipients) with *Clayworth* v. *Bonta*, 295 F. Supp. 2d 1110 (E.D. Cal. 2003) (holding that in § 1396a(a)(30)(A) "Congress created rights to quality care and equal access that may be enforced by Medicaid recipients under § 1983.").[5]

The defendants argue that § 1396a(a)(30)(A) does not unambiguously demonstrate congressional intent to confer individual or personal rights on plaintiffs because (1) plaintiffs are not the intended beneficiaries of the statute insofar as the statute pertains only to what a State's Title XIX plan should contain to satisfy federal law; (2) the statute is not phrased in terms of the

---

[5]Most courts after *Gonzaga* have stated that providers do not have enforceable rights under § 1396a(a)(30)(A). *See, e.g., Long Term Care Pharmacy Alliance* v. *Ferguson*, 362 F.3d 50, 58-59 (1st Cir. 2004); *In re NYAHSA Litig.*, –F. Supp. 2d–, 2004 WL 1126348, at *9 (N.D.N.Y. May 20, 2004); *Burlington United Methodist Family Servs. Inc.* v. *Atkins*, 227 F. Supp. 2d 593, 595-96 (S.D.W.V. 2002). *But see, AARM* v. *Minnesota Comm'r of Human Servs.*, No. 03-2438, 2003 WL 22037719, at *7-8 (D. Minn. Aug. 29, 2003).

persons benefitted; and (3) the statute has only an aggregate focus and does not deal with individual rights.

Most of defendants' arguments, however, fail based on another portion of the federal Medicaid Act, 42 U.S.C. § 1320a-2. That statutory section provides:

> In an action brought to enforce a provision of this chapter, such provision is not deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This Section is not intended to limit or expand the grounds for determining the availability of private action to enforce State plan requirements other than by overturning any such grounds applied in *Suter* v. *Artist M.*, 112 S.Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter* v. *Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

This section was passed in 1994 after the Supreme Court's decision in *Suter* v. *Artist M*, 503 U.S. 347 (1992). The Court in *Suter* held that § 671(a)(15) of the Adoption Act was unenforceable by a private person in part because that section merely required states to have a plan that contained a specific provision requiring states to make certain reasonable efforts. *Id.* at 358-59. As the plain language of § 1320a-2 illustrates, it was enacted to overrule *Suter* in part.[6] *See Messier* v. *Southbury Training Sch.*, 916 F. Supp. 133, 144 (D. Conn. 1996) ("[T]he fairest reading of Section 1320a-2 is that Congress was concerned only that a court should not eviscerate an otherwise enforceable right merely because it appears in a statute mandating that participating states include a particular provision in their state plans.").

---

[6]Language identical to that of § 1320a-2 is contained in another statutory section, 42 U.S.C. § 1320a-10. This court is unaware of why this is so and, as one court has theorized, it may in fact be a mistake. *See Clayworth,* 295 F. Supp. 2d at 1120 ("These statutes are identically worded, and the fact that there are two such statutes is probably a mistake.").

Based on § 1320a-2, § 1396a(a)(30)(A) will not be deemed unenforceable simply because it only elaborates on what a state plan must include. Other courts have reached similar conclusions applying this and other portions of the federal Medicaid Act. *See Clayworth*, 295 F. Supp. 2d at 1121 (in private action to enforce § 1396a(a)(30)(A), relying on § 1320a-2 to conclude that "the court will not consider that an individual entitlement is absent simply because the wording of the statute is directed to the required contents of a state plan as opposed to the rights of a beneficiary or provider under a plan."); *see also, Rabin* v. *Wilson-Coker*, 362 F.3d 190, 201 (2d Cir. 2004) (in an action brought under a separate portion of the Medicaid Act, noting that § 1320a-2 "precludes defendant from relying on the plan requirement language of Section 1386r-6" to support claim that no enforceable rights were present in that statute).

Several other considerations persuade the court that § 1396a(a)(30)(A) confers rights on plaintiffs enforceable pursuant to § 1983. Initially, the requirement of equal access is not phrased in indirect terms "such as requiring a general policy or requiring substantial compliance." *Clayworth*, 295 F. Supp. 2d at 1123. As the *Clayworth* court observed, if the statutory section were phrased indirectly or in more general terms (such as in *Gonzaga* and *Blessing*), "that might suggest that no single beneficiary is entitled to quality care or equal access." *Id.* at 1123. Instead, the requirements of equal access are phrased in mandatory and not precatory language. *See Sabree* v. *Richman*, 367 F.3d 180, 190 (3d Cir. 2004) (citing *Blessing*, 520 U.S. at 341). States "must" have a plan that affords equal access and there can be no dispute that the access provisions directly benefit recipients, as several circuit courts have found. *Pennsylvania Pharmacists*, 283 F. 3d at 537; *Evergreen Presbyterian Ministries*, 235 F. 3d at 928-29. In addition, dissimilar to the statute in *Gonzaga*, the court has not been presented with anything

12

suggesting that administrative procedures exist through which recipients can seek equal access to health care. Through § 1396a(a)(30)(A), a mandatory obligation was imposed on states and no administrative mechanism was formulated so as to ensure compliance with this obligation. This further weighs in favor of a private right of action to enforce this statutory section under § 1983.[7]

The court acknowledges that the language of § 1396a(a)(30)(A) is not similar to the typical rights creating language in, for example, Title VI. However, as one court has noted, it is "difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Title XIX language–'A State plan must provide'–from the 'No person shall' language of Titles VI and IX." *Sabree*, 367 F.3d at 190. Indeed, as another court has observed, since the structure of § 1396a(a) lists the general requirements that a state plan must meet, that structure "largely prevented Congress from using the sort of 'no person shall' language cited by the *Gonzaga* Court." *Clayworth*, 295 F. Supp. 2d at 1122. That would, perhaps, be why Congress enacted § 1320a-2, to ensure that direction to include certain provisions in a state plan does not preclude a private action enforceable under § 1983.

---

[7]There is also legislative history supporting a private right of action for recipients to enforce § 1396a(a)(30)(A) under § 1983. In 1997, Congress repealed the Boren Amendment, which required states to pay providers rates that "the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal law." *Wilder* v. *Virginia Hosp. Ass'n*, 496 U.S. 498, 503 (1990). In repealing the Boren Amendment, legislative history evinces Congress' intent only to end provider suits. *See* H.R. Rep. No. 105-149, at 590 (1997) ("It is the Committee's intention that, following enactment of this Act, neither this nor any other provision of [42 U.S.C. § 1396a] will be interpreted as establishing a cause of action for hospitals and nursing facilities relative to the adequacy of the rates they receive."). Conversely, in passing an amendment to § 1396a(a)(30)(A) in 1981, Congress noted that "in instances where the States or the Secretary fail to observe these statutory requirements, the courts would be expected to take appropriate remedial action." H.R. Rep. No. 97-158, at 301 (1981). As several courts have noted, this implies that Congress intended some class of plaintiffs, most likely recipients, to be able to enforce the provisions of § 1396a(a)(30)(A) by private suit under § 1983. *E.g.*, *Pennsylvania Pharmacists*, 283 F.3d at 540-41; *Clayworth*, 295 F. Supp. 2d at 1123.

Finally, the court finds further support for the conclusion that § 1396a(a)(30)(A) provides enforceable rights to plaintiffs in cases where the Supreme Court has already found such enforceable rights. In *Wilder*, the Court considered whether the now repealed Boren Amendment conferred enforceable rights on medical providers. The specific portion of the Boren Amendment provided that

> a State plan for medical assistance must–
> **\*\*\***
> provide . . . for payment . . . of the hospital services, nursing facility services and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates . . . *which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and Federal law, regulations and quality and safety standards, and to assure that individuals eligible for medical assistance have reasonable access . . . to inpatient hospital services of adequate quality.

*Wilder*, 496 U.S. at 2514 (citing 42 U.S.C. § 1396a(a)(13)(A) (1982 ed. Supp. V)) (emphasis in original.)

The *Wilder* Court concluded that this statutory provision did confer enforceable rights on medical providers because (1) it was cast in mandatory rather than precatory terms and (2) the receipt of federal funds was expressly conditioned on compliance with the Amendment. *Id.* at 513. In *Gonzaga*, the Court made clear that it was not overruling *Wilder*, and explained that case by stating that the Boren Amendment "explicitly conferred specific monetary entitlements upon the plaintiffs." 536 U.S. at 280 (discussing *Wilder* and noting that "Congress left no doubt of its intent for private enforcement, we said, because the provision required States to pay an 'objective' monetary entitlement to individual health care providers, with no sufficient administrative means of enforcing the requirements against States that failed to comply.").

14

In light of *Wilder*, which other courts have noted is still good law, *see Sabree*, 367 F.3d at 192, § 1396a(a)(30)(A) must provide a private right of action enforceable under § 1983. The structure and language of the two statutes are nearly identical, and each focuses on mandatory obligations a state plan must meet. *See Sabree*, 367 F.3d at 192 ("Our confidence in this conclusion rests securely on the fact that the Court has refrained from overruling *Wright* [v. *Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418 (1987)][8] and *Wilder*, which upheld the exercise of individual rights under statutes that contain similar (or, in the case of *Wilder*, identical) provisions to 42 U.S.C. § 1396."). If a private right of action was allowed in *Wilder*, there is no principled basis to say that a private right of action is unavailable in this case.[9]

Thus, for all of the above reasons, the court concludes that § 1396a(a)(30)(A) does confer individual rights on plaintiffs which are enforceable pursuant to 42 U.S.C. § 1983.

**B.     EPSDT Provisions**

As noted above, the EPSDT provisions are located in several different portions of the federal Medicaid Act. Under 42 U.S.C. § 1396a(a)(10), a state Medicaid plan "must" provide for "making *medical assistance* available, including at least the care and services listed in . . . section 1396(a) of this title." (Emphasis added.) Section 1396d(a) defines the term "medical assistance"

---

[8]*Wright* dealt with a rent ceiling provision imposed under the Brooke Amendment to the Housing Act of 1937. The Court concluded that a private right of action under § 1983 was available because the provision unambiguously conferred "a mandatory [benefit] focusing on the individual family and its income." 479 U.S. at 430. The statute at issue provided "[a] family shall pay as rent for a dwelling unit assisted under this chapter . . . the highest of the following amounts . . . ." 42 U.S.C. § 1437a.

[9]In *Sanchez* v. *Johnson*, the court stated that under § 1396a(a)(30)(A) there is no "specific monetary entitlement conferred upon Medicaid recipients . . . ." 301 F. Supp. 2d at 1064. Thus, the court concluded that "there is no rights-creating language in § 30(A) bestowing an enforceable right upon Plaintiffs." *Id.* There is no doubt that there is no objective "monetary entitlement" in § 1396a(a)(30)(A), but this court finds that distinction irrelevant. What § 1396a(a)(30)(A) does provide is an objective entitlement to access, that being equal access to quality medical care.

15

to include "early and periodic screening, diagnostic, and treatment services (as defined in subsection (r) of this section) for individuals who are eligible under the plan and are under the age of 21 . . . ." 42 U.S.C. § 1396d(a)(xiii)(4)(B). The EPSDT services are defined in § 1396d(r)(1)-(4) and include, among other things, screening, vision, dental and hearing services. Moreover, under § 1396a(a)(43), a state Medicaid plan "must" also provide for

> (A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance . . . of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases,
> (B) providing or arranging for the provision of such screening services in all cases where they are requested,
> (C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and
> (D) reporting to the Secretary . . . the following information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year:
> (i) the number of children provided child health screening services,
> (ii) the number of children referred for corrective treatment (the need for which is disclosed by such child screening services),
> (iii) the number of children receiving dental services, and
> (iv) the State's results in attaining the participation goals set for the State under section 1396d(r) of this title.

Prior to *Gonzaga*, the Seventh Circuit had allowed suit under § 1983 to enforce certain EPSDT provisions. *See Miller by Miller* v. *Whitburn*, 10 F.3d 1315, 1319-20 (7th Cir. 1993); *Bond* v. *Stanton*, 655 F.2d 766 (7th Cir. 1981); *see also, Pediatric Specialty Care, Inc.* v. *Arkansas Dep't of Human Servs.*, 293 F.3d 472, 479 (8th Cir. 2002); *Westside Mothers* v. *Haveman*, 289 F.3d 852, 862-63 (6th Cir. 2002). One other circuit court has disagreed at least in part. *See Frazar* v. *Gilbert*, 300 F.3d 530, 545 (5th Cir. 2002) *rev'd on other grounds sub nom Frew* v. *Hawkins*, __U.S. __, 124 S.Ct. 899 (2004) (although noting that relief under § 1983 for a

16

violation of EPSDT provisions "may be available," holding "that plaintiffs cannot sue under § 1983 to require a plan to meet statewide or systemwide participation or performance measures, because, under *Blessing*, state compliance with such standards is not an individualized right actionable under § 1983."). In the October 17, 2001 memorandum opinion and order, this court cited several other cases which had allowed suit under § 1983 to enforce the EPSDT provisions. *See Danjour B.* v. *New York*, No. 00 CIV 2044 (JGK), 2001 WL 830674, at *8 (S.D.N.Y. July 23, 2001); *Salazar* v. *District of Columbia*, 954 F. Supp. 278, 324 n.92 (D.D.C. 1996); *Wellington* v. *District of Columbia*, 851 F. Supp. 1, 6 (D.D.C. 1994); *New York Coalition to End Lead Poisoning* v. *Giulliani*, 720 N.Y.S. 2d 298, 301 (N.Y. Sup. Ct. 2000).

After *Gonzaga*, the court has found only a few cases addressing this issue, and most have stated that the EPSDT provisions are enforceable by private right of action under § 1983. *See Kenny A. ex rel. Winn* v. *Perdue*, 218 F.R.D. 277, 293-94 (N.D. Ga. 2003); *Collins* v. *Hamilton*, 231 F. Supp. 2d 840, 846-47 (S.D. Ind. 2002)[10]; *S.D.* v. *Hood*, No. Civ. A 02-2164, 2002 WL 31741240, at *4-6 (E.D. La. Dec. 5, 2002).

Defendants argue that, after *Gonzaga*, these EPSDT provisions cannot afford rights enforceable under § 1983 for many of the same reasons they claimed above. First, defendants state that these provisions only concern the requirements of a state's Medicaid plan and, moreover, only describe the elements that must be included in a Title XIX state plan. This argument fails based on the court's discussion of § 1320a-2. That statutory section would apply with equal force to the EPSDT provisions and, accordingly, that the EPSDT provisions speak

---

[10]The Seventh Circuit affirmed the *Collins* decision at 349 F.3d 371 (7th Cir. 2003). There is no discussion as to whether the EPSDT provisions afford enforceable rights under § 1983. This court is unable to conclude that the Seventh Circuit's silence on the subject can be construed as precedent.

only in terms of what a plan must include and do not focus on the person benefitted does not render these EPSDT provisions unenforceable by private action.

Defendants also argue that the EPSDT provisions do not confer any specific monetary or other entitlement on the plaintiffs. True, there is no monetary entitlement at issue in these provisions, but that is irrelevant. The court disagrees with defendants' characterization that no entitlements are otherwise presented in these provisions. First, the EPSDT provisions themselves defined in § 1396d(r) are considered "medical assistance" and, therefore, "must be provided" in a state's plan. Moreover, § 1396a(a)(43) provides several specific entitlements that plaintiffs "must" be provided, including (1) that they are informed of the availability of periodic screening, diagnostic, and treatment services and the need for age-appropriate immunizations against vaccine preventable diseases, (2) that they are provided arrangement of screening services in all cases where they have been requested, and (3) that they are provided arrangement for corrective treatment when disclosed by a child health screen. Notice once again the language in all of these EPSDT provisions is mandatory and not precatory. Moreover, similar to above, the court has not been presented with any administrative mechanisms to enforce these specific EPSDT entitlements afforded on plaintiffs. Rights are provided under these provisions, and no avenue is presented to vindicate these rights. Finally, similar to the argument above, the language contained in the EPSDT provisions is nearly identical to that of *Wilder* and no reason exists to distinguish this case so long as *Wilder* remains good law.

Defendants, in response, suggest that this court should rely on the Fifth Circuit's decision in *Frazar*. The court in *Frazar* interpreted the EPSDT provisions and, while seemingly acknowledging that individuals could in some circumstances vindicate rights provided under the

18

EPSDT requirements, *see* 300 F.3d at 544, noted that no actionable individual rights were afforded by a state's "failure to meet . . . a participation goal or other systemwide performance standard" under the EPSDT requirements. *Id.* at 545. The *Frazar* court noted that the district court lacked "the power to impose systemwide standards under § 1983, since such standards do not give rise to individual rights." This conclusion conflicts with the holdings of cases cited by this court in its October 17, 2001 memorandum opinion and order. *See, e.g., Dajour B.*, 2001 WL 830674, at *9-10; *see also, Pediatric Specialty Care, Inc.*, 293 F.3d at 479 (holding that EPSDT provisions imposed a binding obligation on states "to create a state plan that includes the provision of EPSDT services" and that this requirement was not "so ambiguous or amorphous that its enforcement strains judicial competence."). Insofar as *Frazar* was decided before *Gonzaga*, and as a result *Gonzaga* did not influence the *Frazar* decision, the court simply sees no reason to find *Frazar* more persuasive than the cases previously relied on. Furthermore, *Frazar* would also appear in conflict with precedent binding on this court which has allowed actions seeking modification of state Medicaid plans that do not sufficiently implement EPSDT provisions. *Bond*, 655 F.2d at 768-69. Defendants' argument on this ground, therefore, must be rejected.

Thus, for the reasons stated above, the court concludes that the EPSDT provisions also confer individual rights on plaintiffs which may be enforced pursuant to 42 U.S.C. § 1983.

## III. Findings of Fact

## A. Background

1. The plaintiff class consists of all children (persons under the age of 18) in Cook County, Illinois, who, on or after July 1, 1990, have been, are, or will be eligible for the Medical

Assistance Program ("Medicaid") established under Title XIX of the Social Security Act.

2. A state participating in the Medicaid program is required to satisfy the Secretary of the United States Department of Health and Human Services that it complies with the requirements of federal law. The United States Department of Health and Human Services reimburses a participating state by matching the state's expenditures on the covered services provided through the program. The agreement between the United States Department of Health and Human Services and the participating state is evidenced in the State Plan for Title XIX. (Ellinger Trial Tr. at 776:11-777:17, 778:1-24.)

3. Illinois participates in the Medicaid program and has filed a Title XIX State Plan with the Secretary of the United States Department of Health and Human Services. (Def. Ex. 86.)

4. There are approximately 800,000 children on Medicaid in Illinois, and approximately 600,000 of those children are in Cook County. (Joint Ex. 1 at 280683.)

5. The Illinois Department of Public Aid ("IDPA") is the single state agency responsible for the administration of the Medicaid program in Illinois. (Admitted, Defendants' Response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("DRFFCL"); Ellinger Trial Tr. at 804:11-805:6; Powers Dep. Tr. at 9:17-10:5.)

6. Defendant Barry S. Maram is sued in his official capacity as the Director of IDPA. (Admitted, DRFFCL.)

7. IDPA has delegated to the Illinois Department of Human Services ("IDHS") the responsibility for carrying out some personal interactions with children and their families under the Medicaid program. IDHS administers local offices throughout the state where applicants can apply for Medicaid, and IDHS local office staff are the primary personal contact with Medicaid

applicants and recipients. IDHS local offices determine whether applicants are eligible for the Medicaid program. (Lopez Dep. Tr. at 13:18-14:15; 15:13-21.)

7. Defendant Carol L. Adams is sued in her official capacity as the Secretary of IDHS. (Admitted, DRFFCL.)

**B.    Equal Access**

8. IDPA sets the qualifications for medical providers to participate in the Medicaid program and sets reimbursement rates for providers of pediatric services. (Defendants' Response to Plaintiffs' Proposed Statement of Contested and Uncontested Facts ("DRPUF") ¶ 19; A. Kane 6/06/02 Dep. Tr. at 27:17-29:15.)

9. Medicaid reimbursement rates are determined primarily by the amount of funds allocated to IDPA by the Illinois Bureau of the Budget (the "available pie"). IDPA does not consider or study the effect of rate increases or decreases on provider participation nor does it compare Medicaid rates to Medicare or private insurance rates. (Powers Dep. Tr. at 69:21-78:13; Werner Dep. Tr. at 111:1-11, 133:21-142:21, 143:2-20, 144:10-146:20 161:20-162:20, 196:9-13; Luttrell Dep. Tr. at 50:2-9; Kane 6/06/02 Dep. Tr. at 69:1-19, 162:7-17, 162:23-163:2, 163:7-22, 164:4-7, 231:3-20, 232:6-11, 232:18-233:18, 244:3-9.)

10. IDPA decreased rates by 3% in 2002 solely because of a budget downturn. (Powers Dep. Tr. at 182:14-16, 182:18-185:5; Kane 6/06/02 Dep. Tr. at 225:4-13, 225:21-22.)

11. If IDPA were to be allocated more funds from the Bureau of the Budget, IDPA represents that it would increase provider reimbursement rates. (Kane 6/06/02 Dep. Tr. at 69:1-19.)

12. The costs of medical practice are generally 20% more expensive in Cook County than in downstate Illinois, yet the Medicaid reimbursement rates in Cook County are the same as the rates elsewhere in the state. (Flint Trial Tr. at 699:1-25, 749:23-750:4.)

13. IDPA creates a schedule of reimbursement rates for each service that physicians regularly provide to plaintiffs. (Powers Dep. Tr. at 69:21-78:13; Def. Ex. 102.) IDPA creates that schedule without taking into account any of the factors that could result in a willingness by doctors to provide an appropriate level of care to the plaintiffs. (Werner Dep. Tr. at 111:1-11, 133:21-142:21, 144:10-146:20, 161:20-162:20, 196:9-13; Kane 6/06/02 Dep. Tr. at 125:2-5, 125:12-15, 125:17-126:21, 127:25-128:4, 128:8-10, 128:12-22, 173:13-174:6, 174:10-175:4, 175:14-176:9, 190:8-11, 191:2-3, 191:5-19, 200:3-7, 200:19-20, 204:19-205:4, 231:3-20, 232:6-11, 232:18-233:18, 244:3-9, 244:14-21; Powers Dep. Tr. at 69:21-78:19; Luttrell Dep. Tr. at 50:2-9.)

14. Dr. Samuel Flint ("Dr. Flint"), plaintiffs' expert, compared Illinois' Medicaid reimbursement rates for pediatric physician services in Cook County to (a) Medicare rates for the same region and (b) private insurance reimbursement rates for the same region. Dr. Flint concluded that Medicaid reimbursement rates are, on average, approximately half of the Medicare reimbursement rates for the same service, delivered in the same location, by the same provider. (Flint Trial Tr. at 707:3-25; Pl. Ex. 105 at Bates No. MO3 000739.)

15. Dr. Flint has been a consultant in the fields of health policy, health economics and child health care. He received his Ph.D. from the University of Chicago. (Admitted, DRFFCL, DRPUF ¶ 485; Flint Trial Tr. at 676:20-682:11.)

22

16. Medicare rates for services, including services provided to children, are compiled by a federal agency, the Centers for Medicare and Medicaid Services ("CMS"), in collaboration with the American Medical Association, based on the cost of providing the service. These rates are then modified to take into account regional differences in costs. Medicare rates are set to allow a physician to recover overhead costs and a modest profit. (Flint Trial Tr. at 695:9-699:25; Krug Trial Tr. at 299:18-305:23.) Health care economic analysts and other government agencies generally use Medicare reimbursement rates as a benchmark in considering the adequacy of Medicaid reimbursement rates. (*Id.*; Flint Trial Tr. at 713:17-25; Pl. Ex. 105 at Bates No. MO3 000735-MO3 000736.)

17. The most commonly billed service in the Illinois Medicaid program is the "Established Patient Office Visit; Moderate Complexity." The maximum Medicaid reimbursement rate received for this service in 2002 was $29.85 (this includes an add-on rate which was paid to only 37% of the providers who billed for this service). The Medicare reimbursement rate for this same service was $54.16. Thus, Medicaid paid, at most, only 55% of the rate that Medicare paid for the same service. The rate Illinois paid to 63% of billing physicians was even lower because those physicians did not receive the "add-on." (Pl. Ex. 105 at Bates No. MO3 000738-MO3 000739.)

18. Medicaid reimbursement rates are also, on average, significantly lower than private insurance reimbursement rates for the same pediatric service in Cook County.[11] (Flint Trial Tr. at

---

[11]Defendants object to Dr. Flint's methodology in using only two Cook County pediatric populations with a combined caseload of 14,000 patients as representative of the prevailing Cook County private insurance market rates. Although Dr. Flint himself conceded that such an analysis was "unscientific by accepted rigorous research standards," he stated that it was the best available evidence under the circumstances, and his conclusion is supported by extensive evidence in the record. Several doctors testified that in their experience, Medicaid reimbursement rates

(continued...)

708:1-710:25; Pl. Ex. 105 at MO3 000739.)

19.  Dr. Flint also analyzed a physician's cost to practice in Cook County and concluded that the Medicaid rates do not even cover a physician's cost of overhead, much less provide any remuneration to the physician. (Flint Trial Tr. at 714:1-716:9; Pl. Ex. 105 at Bates No. MO3 000740-MO3 000741.) Dr. Flint's opinion was confirmed by numerous physician witnesses at trial. (Abelson Trial Tr. at 636:1-19; Green Trial Tr. at 530:19-534:3; Krug Trial Tr. at 272:21-273:25, 274:23-276:10; Lelyveld Trial Tr. at 331:8-332:11, 333:9-334:3; Rosenberg Trial Tr. at 76:13-23; Jurado Trial Tr. at 428:13-429:5, 430:5-11.)

20.  Dr. Flint concluded that, based on his analyses, insufficient access for Medicaid beneficiaries should be expected in Cook County. (Pl. Ex. 105 at MO3 00743.)

21.  Medicaid also has a lengthy payment cycle. (Rosenberg Trial Tr. at 78:12-17; Krug Trial Tr. at 274:2-18 ("Medicaid is now not only our worst payer in terms of percent reimbursement, they are also the slowest to pay us."); Jurado Trial Tr. at 430:14-17 ("Well, usually for a private insurance, [the payment cycle is] about a few weeks to a month. For Medicaid cycle, it could be anywhere from two months to six months. It depends on the year."); Werner Dep. Tr. at 159:12-23; S. Saunders Dep. Tr. at 183:19-187:16.)

22.  Physicians billing Medicaid must also deal with so-called "Medicaid hassles," which Dr. Flint described as annoyances serious enough to influence a physician's decision to

---

[11](...continued)
are significantly lower than private reimbursement rates for the same pediatric services in Cook County. (Lelyveld Trial Tr. at 331:8-25; Green Trial Tr. at 530:4-11, 530:19-534:3; Krug Trial Tr. at 302:10-18; Rosenberg Trial Tr. at 76:8-12; Jurado Trial Tr. at 426:14-20, 427:6-13; Newman Trial Tr. at 669:12-671:7; Abelson Trial Tr. at 636:1-19.) Moreover, an analysis the IDPA performed of private market rates in Springfield also supports the conclusion that Medicaid reimbursement rates are significantly lower than private insurance reimbursement rates. (Pl. Ex. 41 at 273321.)

participate in Medicaid or limit participation in Medicaid. (Flint Trial Tr. at 720:1-7.) Dr. Flint described these hassles as "claims processing, how quickly claims are paid, retroactive claim denials, how often claims are denied, Medicaid rule complexity, eligibility determination, all of the costs and the extent of the completion of the form, et cetera." (Flint Trial Tr. at 720:8-12.) Examples brought out by physicians testifying at trial included (1) Illinois Medicaid using a different form than other issuers which physicians had to submit in a specific format (Rosenberg Trial Tr. at 78:18-79:4); (2) a higher rate of rejection as compared to third-party payers (*id*); and (3) Medicaid only paying for one service per day, regardless of whether a Medicaid recipient receives and/or requires several different services at one time. (Krug. Trial Tr. at 276:11-278:20; Newman Trial Tr. at 666:13-669:10.)

23. A pediatrician practice relying solely on Medicaid beneficiaries maximum reimbursements could not survive since Medicaid pays nearly 10% less than the median practice costs. (Flint Trial Tr. at 714:1-716:9; Pl. Ex. 105, at Bates No. MO3 000740-MO3 000741; Pl. Ex. 56; Pl. Ex. 57; Pl. Ex. 59; Rosenberg Trial Trans. at 79:9-25; Green Trial Tr. at 539:5-14.)

24. Physician professional societies regularly complain to the IDPA regarding the low Medicaid reimbursement rates and physician participation. (D. Saunders 11/26/02 Dep. Tr. at 235:7-236:10, 241:6-15; Powers Dep. Tr. at 165:20-167:17; S. Saunders Dep. Tr. at 170:23-172:19, 173:9-174:7; Rosenberg Trial Tr. at 80:1-85:22, 93:5-94:20; Lelyveld Trial Tr. at 345:8-347:24; Krug Trial Tr. at 278:22-280:12; Pl. Ex. 46; Pl. Ex. 59; Pl. Ex. 94.)

25. The primary issue for the provider constituency of the Illinois Chapter of the American Academy of Pediatrics ("ICAAP") is increasing provider participation in the Medicaid program through increases in pediatric reimbursement rates. A coalition of pediatricians and

25

child advocacy groups is advocating with the State to increase reimbursement rates to pediatricians in order to increase the numbers of physicians participating in the Medicaid program. (Pl. Ex. 46; Rosenberg Trial Tr. at 95:21-96:4; Green Trial Tr. at 544:22-546:4; S. Saunders Dep. Tr. at 170:23-172:19, 173:9-174:7, 175:1-21, 179:14-180:12, 183:19-187:16; Lelyveld Trial Tr. at 345:8-347:24.)

26. ICAAP was unable to recruit its own membership to participate more fully in the Medicaid program during the contract period in which IDPA paid ICAAP to try and recruit more providers to participate in Medicaid. (Lelyveld Trial Tr. at 346:24-347:24.)

27. Pediatric departments that practice at major hospitals in Cook County have large Medicaid patient populations and are sustaining significant losses each year due to low Medicaid reimbursement rates. (Pl. Ex. 55; Pl. Ex. 56; Pl. Ex. 57, Pl. Ex. 59; Abelson Trial Tr. at 636:1-19, 637:1-9, 639:5-14; Green Trial Tr. at 538:13-539:14; Lelyveld Trial Tr. at 327:5-15, 330:10-331:4, 331:8-332:11, 33:9-334:3; Jurado Trial Tr. at 430:21-431:7; Krug Trial Tr. at 271:4-19, 271:20-272:5, 272:21-273:25, 295:15-20, 308:11-14.)

28. As part of his analysis, Dr. Flint also looked into the effect that low reimbursement rates have on a physician's willingness to provide care to Medicaid patients, including a comparison of the physician's willingness to provide care to privately insured children. (Flint Trial Tr. at 716:10-723:21.) Dr. Flint has been actively studying this issue for 25 years, and to prepare his report he canvassed a wealth of literature on this topic. (*Id.*; Pl. Ex. 105 at Bates No. MO3 000741-MO3 000743.)

29. The major studies on physician reimbursement rates have concluded that physician reimbursements are the predominant factor in the decision to participate in the Medicaid program

at all, to participate in a limited fashion, or to participate fully. When Medicaid rates are too low, physicians will opt to treat non-Medicaid children first or exclusively. Pediatricians also limit their Medicaid practices because of an unpredictable Medicaid payment system and Medicaid payment delays. (Flint Trial Tr. at 719:4-23, 721:15-722:1; Pl. Ex. 105 at Bates No. MO3 000741-MO3 000743.)

30. Pediatric practices throughout Cook County have closed to new Medicaid patients due to economic problems caused by a high Medicaid pediatric population and low Medicaid reimbursement rates and slow Medicaid payment systems. (Flint Trial Tr. at 721:15-723:5; Lelyveld Trial Tr. at 337:19-338:4, 342:14-344:22; Pl. Ex. 52; Abelson Trial Tr. at 639:19-642:1; 644:5-18; Jurado Trial Tr. at 432:17-434:23, 435:18-20, 436:19-22; Newman Trial Tr. at 660:16-662:13; S. Saunders Dep. Tr. at 183:19-187:16; Krug Trial Tr. at 291:12-295:9, 306:19-307:10.)

31. Pediatric patients throughout Cook County who are on Medicaid are more likely to be seen at a federally qualified health clinic ("FQHC") or a resident clinic rather than by a private pediatrician due to a limited number of private physicians who accept Medicaid. (Krug Trial Tr. at 293:12-295:9, 306:19-307:10; Lelyveld Trial Tr. at 337:19-338:4, 344:15-22; Jurado Trial Tr. at 438:8-439:2; D. Saunders 7/29/03 Dep. Tr. at 143:15-146:17.)

32. Medical care provided by a private pediatrician is superior to the care provided by a clinic or emergency room because a private physician can provide consistency and a medical home for a child. (Rosenberg Trial Tr. at 98:15-100:5.)

33. FQHC's are created and located to serve a neighborhood or population that the federal government has determined is medically underserved. (Ellinger Trial Tr. at 844:12-845:25.) In such cases, FQHCs are located to serve areas in which there are an insufficient

number of other doctors to provide care to Medicaid-enrolled children in that area. (*Id.*; Ellinger Dep. Tr. at 54:9-55:23.)

34. FQHCs are reimbursed based on a flat encounter rate, meaning that they receive reimbursement for every visit on a given day by an eligible and enrolled individual, whether the individual simply sees a doctor or receives more care. (Werner Trial Tr. at 1059:6-13.) The encounter rates are set by federal statute based on reasonable costs. (Werner Trial Tr. at 1059:6-1060:6.)

35. The University of Chicago hospitals' pediatric department had a clinic on the south side of Chicago. The clinic's mission was, in part, to provide care to the poor. Previously, the clinic made an economic decision to close its practice to Medicaid patients and to open new practices in areas that do not have large Medicaid patient populations due to the low reimbursement rates for Medicaid. Only recently has the clinic begun seeing Medicaid patients again. (Abelson Trial Tr. at 640:21-641:12, 642:15-643:8; Lelyveld Trial Tr. at 342:14-344:4; Pl. Ex. 52.) The clinic was reopened because University of Chicago hospitals agreed to absorb the losses incurred in operating the clinic since it serves as a training site for residency programs. (Abelson Trial Tr. at 640:21-641:12.)

36. Children's Memorial Hospital has plans to expand its pediatric specialty care clinics in suburban areas that have a low percentage of Medicaid recipients. It cannot afford to expand care in areas with a high population of Medicaid patients due to the low reimbursement rates for Medicaid. (Green Trial Tr. at 539:21-541:18.)

37. Dentists limit the number of Medicaid patients they will see because their practices would fail financially if they accepted all Medicaid patients who presented themselves for

28

treatment due to the Medicaid reimbursement rates. (Jurado Trial Tr. at 426:14-427:18, 428:17-429:5, 430:5-17, 430:21-431:7, 431:17-21, 432:17-434:23, 435:2-20; Pl. Ex. 59; Pl. Ex. 89; Pl. Ex. 91; Pl. Ex. 94.)

38. A pediatric dentist is a dentist that has spent two or three years in a residency program treating children only. Pediatric dentists treat children using behavior management techniques through non-pharmacologic and pharmacologic methods. (Jurado Trial Tr. at 416:3-418:25.)

39. There are virtually no pediatric dentists in Cook County who accept Medicaid reimbursement. Dentists have difficulty referring children with Medicaid to a pediatric dentist in Chicago because virtually all of the pediatric dentists in Cook County do not accept Medicaid patients. (Jurado Trial Tr. at 436:8-18, 437:5-439:2, 451:22-452:11.)

40. Children on Medicaid are less likely to see a pediatric dentist than children with private insurance due to the limited number of pediatric dentists who accept Medicaid reimbursement. (Jurado Trial Tr. at 436:19-22, 440:8-14, 452:9-453:14.)

41. Children who receive primary care in clinic settings ordinarily must wait long periods of time for an appointment and, for a walk-in emergency, must wait in line often for hours or return on a different day. The crowded nature of clinics operates as a disincentive to seeking routine and timely well-child care. Children served by private-pay pediatric practices ordinarily receive much prompter appointments and access to care for emergencies without undue waiting. (Krug. Trial Tr. at 292:6-293:11; Abelson Trial Tr. at 641:13-642:1; Lelyveld Trial Tr. at 337:19-338:4, 341:24-342:10, 344:15-345:7; Jurado Trial Tr. at 435:2-20, 436:10-22.)

42. Parents of young children from time to time need to speak with their pediatrician at night and on weekends. Twenty-four hour emergency call capabilities are an important component of a pediatrician's service, and it can frequently provide needed information and avoid unnecessary trips to the emergency room. (Rosenberg Trial Tr. at 53:19-54:1, 96:10-97:9, 99:14-100:5; D. Saunders 7/29/03 Dep. Tr. at 27:24-29:2; Lelyveld Trial Tr. at 338:5-19, 338:25-339:23.)

43. Children on Medicaid rarely get vision and hearing screens from physicians who provide EPSDT services. (Pl. Ex. 119 at M03 000217-M03 000220; Pl. Ex. 18-20; Pl. Ex. 73-88; Branch Trial Tr. at 493:13-18; Hannum Trial Tr. at 373:13-19.)

44. Board certification of a physician is considered a marker of quality, training and level of competence. (Rosenberg Trial Tr. at 41:21-42:16.) Plaintiffs are more likely to be treated by a doctor who is not a board certified pediatrician due to the limited number of private board certified pediatricians who accept Medicaid. (*Id.* at 101:17-102:18.)

45. A physician must "enroll" in the Medicaid program to receive reimbursement from IDPA. (Luttrell Dep. Trans at 32-7-33:12.) In order to enroll, a provider need not make any commitment to see a certain number of children. (Werner Dep. Tr. at 58:14-59:11; Luttrell Dep. Tr. at 31:14-20, 32:7-33:12.)

46. Of enrolled doctors in Cook County who billed for treating children between July 1, 1998 and December 31, 2001, 63% did not provide a single EPSDT screening examination to any recipient during that same period and approximately 6% of enrolled doctors provided only one well-child examination during that same period of time. (Pl. Ex. 118 at Bates No. M03 000728-30; Darling Trial Tr. at 165:24-168:21.)

47. Most doctors in Cook County will either not see children on Medicaid or significantly limit the number of children on Medicaid that they will accept as patients. (Krug Trial Tr. at 289:24-291:11, 293:12-295:9, 306:19-307:10, 313:24-314:15; Lelyveld Trial Tr. at 337:12-338:4, 342:14-344:14; Pl. Ex. 52; Rosenberg Trial Tr. at 67:15-68:18; Green Trial Tr. at 539:15-540:21; Jurado Trial Tr. at 438:8-439:2: Newman Trial Tr. at 660:16-662:13.)

48. Many providers will refer or "dump" Medicaid patients on the few hospitals and physicians who will accept Medicaid patients. (Abelson Trial Tr. at 634:24-635:24; Newman Trial Tr. at 664:24-665:25; Krug Trial Tr. 289:24-291:11.)

49. Doctors who practice in Cook County have difficulty finding a pediatrician or specialist who will accept referrals of Medicaid patients. Many pediatricians and specialists in Cook County limit their practice by not accepting Medicaid patients or accepting only a limited number of Medicaid patients. By contrast, it is much easier to refer patients with other forms of health insurance. (Krug Trial Tr. at 291:12-293:11, 293:12-295:9, 306:19-307:10; Lelyveld Trial Tr. at 341:24-345:7, Pl. Ex. 52; Rosenberg Trial Tr. at 70:12-20, 71:24-73:7; Jurado Trial Tr. at 438:8-439:2; Newman Trial Tr. at 663:8-665:25.)

50. A substantial number of children on Medicaid have had adverse health outcomes because they have not been able to see a pediatrician regularly due to their difficulty in finding a pediatrician. In addition, waiting times in specialty treatment clinics for the plaintiffs are long and oftentimes put patients in danger. (Krug Trial Tr. at 284:23-287:9, 288:3-25; Lelyveld Trial Tr. at 338:25-341:7, 344:15-345:7; Rosenberg Trial Tr. at 71:24-72:20; Jurado Trial Tr. at 435:2-436:7.)

31

51. A higher percentage of patients who are on Medicaid do not have a regular pediatrician. A much lower percentage of patients with other forms of insurance do not have a regular pediatrician. (Krug Trial Tr. at 284:23-285:17, 287:16-288:2, 289:1-23, 306:2-307:10; Lelyveld Trial Tr. at 338:20-24, 341:16-23, 347:25-348:12; Rosenberg Trial Tr. at 73:3-7.)

52. The numbers of pediatric patients on Medicaid coming to emergency rooms to receive treatment for primary care issues because they cannot find a primary care physician to treat them has been increasing significantly due to a lack of pediatricians who accept Medicaid. (Krug Trial Tr. at 284:23-287:9; Lelyveld Trial Tr. at 327:5-15.)

53. Medicaid recipients have difficulty locating quality pediatric primary and specialty care providers and pediatric dentists for their children. IDPA and IDHS do not provide assistance to Medicaid recipients in locating quality pediatric primary and specialty care providers and pediatric dentists, scheduling medical appointments, or in arranging for transportation to health care providers. Medicaid recipients may have to travel great distances to find a dentist or pediatric provider willing to accept Medicaid, if they can find one at all. Children on Medicaid frequently seek care at emergency rooms because they cannot find a pediatrician willing to accept Medicaid. Medicaid recipients often must wait several hours to see a provider at a clinic willing to accept Medicaid. (Branch Trial Tr. at 491:9-495:20; Hannum Trial Tr. at 371:4-374:9, 377:8-380:8, 380:20-381:14, 383:2-14; Craft Trial Tr. at 484:12-488:8; Mauk Trial Tr. at 225:2-243:8, 244:8-24; Rosenberg Trial Tr. at 69:22-70:22, 102:12-18; Rodriguez Trial Tr. at 397:22-398:22; Lopez Dep. Tr. at 18:22-26:18, 34:1-35:19, 75:19-79:12, 79:18-86:5.)

54. Medicaid recipients must often engage in extensive efforts to locate dentists and pediatric primary and specialty care providers willing to accept Medicaid, including seeking referrals from state agencies or local charities, calling physicians listed in the phone book, and paying for care out of their own pockets. Medicaid recipients are often referred by the IDPA's hotline to doctors who are unwilling to accept new Medicaid patients. (Branch Trial Tr. at 495:9-20; Craft Trial Tr. at 484:12-488:8; Mauk Trial Tr. at 242:20-243:8; Bassler Trial Tr. at 355:22-360:1; Rodriguez Trial Tr. at 394:1-397:21; Hannum Trial Tr. at 366:23-371:3; Ellinger Dep. Tr. at 118:18-22, 119:6-120:10.)

55. Several Medicaid recipients testified at trial about problems they have had with Medicaid, including:

a. Yesinia Rodriguez testified that upon enrollment in the Medicaid program, she was not given any information about locating a doctor, was never given a provider directory, and when she asked her own IDHS caseworker for assistance in locating a doctor, her caseworker said that she does not give referrals. (Rodriguez Trial Tr. at 393:21-394:15.) Rodriguez also called the IDPA-administered hotline for a physician referral. She was given the names of approximately ten different doctors who all practiced more than 30 miles away. Not one accepted Medicaid. (Rodriguez Trial Tr. at 394:16-395:15.) Rodriguez called the hotline back, and was given an additional 20 referrals. Once again, not one of the doctors accepted Medicaid. (Rodriguez Trial Tr. at 395:16-396:11.)

b. Elissa Bassler called the IDPA-administered hotline for a physician referral. She was given the names of eight doctors, none of whom would accept Medicaid. (Bassler Trial Tr. at 356:5-357:6.)

c. Benita Branch testified that the one doctor she could find to treat her children on Medicaid would not take appointments. If her children needed medical care, she would have to go in, take a number and wait to be seen–often one to two hours. (Branch Trial Tr. at 493:19-494:19.)

d. Sara Mauk testified that one of the doctors her daughter saw made Medicaid patients wait for an examination until the doctor had finished examining patients with private insurance. (Mauk Trial Tr. at 226:11-227:2.) Mauk also testified that her children could only be seen on certain days of the week because those were designated as "Medicaid days" at the doctors' offices. (*Id.* at 227:11-24.)

e. Bassler testified that she has a son, who is covered under private insurance, and she also serves as guardian for an 11-year-old-girl who is covered under Medicaid. When attempting to take the 11-year-old to the doctor for a throat culture, Bassler called the IDPA's KidCare hotline and was given the names of eight doctors in her area who took Medicaid. When Bassler called these doctors, all of them said that they did not take Medicaid. Bassler also testified that for the 11-year-old's counseling, none of the counseling agencies would take Medicaid and she pays the sliding fee scale out of pocket. By contrast, she has had no problems arranging care for her son. She even recently switched to a new doctor which was one of the doctors that was on the list given to her by the IDPA hotline that would not take Medicaid. (Bassler Trial Tr. at 356:18-360:2.)

f. Mauk testified that she has two adopted children, who are covered under Medicaid, and one biological son who is covered under private insurance. When asked to compare her obtaining medical care for her adopted children as opposed to her biological child, Mauk noted

34

that for her adopted children there "was a lot of delays and I had to be extremely persistent on even getting a timely visit with a doctor and getting an appropriate doctor. And it was always a three-to-six month wait before getting any type of service or evaluation." (Mauk Trial Tr. at 242:25-243:1-5.) For her biological son, Mauk stated that "it was just, you know, a week or ten days and I had the referral or the evaluation or the service." (*Id.* at 243:6-8.)

g. Hannum has one biological daughter who is covered under private insurance and three adopted children covered through Medicaid. For her biological daughter, Hannum stated that she never had any problem finding health care because "[w]hatever doctor I took her to, they took the insurance she had." (Hannum Trial Tr. at 366:21-22.) By contrast, for her adopted children, the same doctor who she took her biological daughter to would not see her adopted children on Medicaid. (*Id.* at 366:23-367:14.)

h. Parents of Medicaid recipients have in some instances had to resort to paying for medical care out of pocket in order to get specialty care for their children. (Mauk Trial Tr. at 229:17-236:9, 239:25-241:6; Bassler Trial Tr. at 358:21-359:15; Hannum Trial Tr. at 378:2-10, 379:18-380:8, 380:20-382:9, 383:2-14.)

56. IDPA staff admit that if reimbursement rates were increased, more providers would participate in the Medicaid program. (Powers Dep. Tr. at 69:21-78:13; D. Saunders 11/26/02 Dep. Tr. at 235:7-236:10; Kane 6/06/02 Dep. Tr. at 69:19, 125:17-126:21, 149:22-150:20, 217:5-218:8; Parker Dep. Tr. at 201:5-202:4, 204:7-12; Werner Dep. Tr. at 133:21-142:21, 153:15-154:14, 155:14-156:14.)

57. IDPA staff have also admitted that IDPA reimbursement rates are low and not very attractive and that they are lower than the usual and customary charges of physicians. (Ellinger

Trial Tr. at 835:23-836:3.)

58. IDPA staff further admit that the length of the IDPA payment cycle affects physicians' willingness to participate in the Medicaid program. (D. Saunders 11/26/02 Dep. Tr. at 235:7-236:10; Werner Dep. Tr. at 159:12-23, 160:18-24; Kane 6/06/02 Dep. Tr. at 206:16-207:3; Parker Dep. Tr. at 204:7-12.)

59. When IDPA has increased rates for office-based medical services, there has been a corresponding increase in the number of office-based services billed by providers. (Kane 6/06/02 Dep. Tr. at 125:17-126:21, 139:14-140:16, 149:22-150:20.)

60. Both Dr. Steven Krug, head of the emergency room at Children's Memorial Hospital, and Dr. Steven Lelyveld, from the University of Chicago hospitals' pediatric emergency room, testified that Medicaid-insured children do not have access to primary care equal to that of privately-insured patients. (Krug Trial Tr. at 306:19-307:10; Lelyveld Trial Tr. at 347:25-348:12.) Dr. Krug testified that the access of Medicaid-enrolled children is "vastly diminished" and "not remotely close" compared with that of privately-insured children. (Krug Trial Tr. at 307:1-2.)

**C.    EPSDT Provisions**

61. EPSDT is an acronym that means early and periodic screening, diagnostic and treatment program. (D. Saunders Trial Tr. at 866:23-867:1.)

62. EPSDT screenings, which are commonly referred to as "well-child" checkups, include the following components, as listed in 42 U.S.C. § 1396d(r)(1)(B): comprehensive health and developmental history, including assessment of both physical and mental development; comprehensive unclothed physical exams; appropriate immunizations according to age and

36

health history; laboratory tests, including lead toxicity screenings; health education, including anticipatory guidance, vision and hearing screenings; and dental screenings. (D. Saunders Trial Tr. at 867:21-868:2.)

63. Under the EPSDT program, Illinois has adopted a periodicity schedule (or a schedule of periodic examinations, tests and services) that calls for seven appointments for health screening services in the first year of life, four appointments in the second year of life, and a decreasing number of annual appointments as a child becomes older. The periodicity schedule also calls for annual vision, hearing and dental screens, and two blood lead screens (at 12 and 24 months of age).

64. Appendix 9 to the IDPA's Handbook for Providers of Healthy Kids Services sets forth the periodicity schedule. It is largely based on the American Academy of Pediatrics' guidelines, but also allows for the recommendations or guidelines of other professional organizations which may vary slightly from the American Academy of Pediatrics' recommendations. (D. Saunders Trial Tr. at 872:13-16; Def. Ex. 4 at App. 9.)

65. The panoply of EPSDT services for children on Medicaid in Illinois and the system used to inform them of those services is generally called the "Healthy Kids Program." (Ellinger Trial Tr. at 801:18-803:3, D. Saunders 5/02/02 Dep. Tr. at 15:20-21, 23:4-15, 27:2-22; Pl. Ex. 127.)

66. IDPA has developed the policies for the Healthy Kids Program. The program is supposed to deliver scheduled preventive health care and early diagnosis and treatment for the plaintiffs. (Ellinger Trial Tr. at 797:6-10, 799:22-25; Pl. Ex. 127; Pl. Ex. 140; D. Saunders 5/02/02 Dep. Tr. at 31:8-33:15.)

67. Timely screening for general medical, vision, hearing and dental conditions and providing immunizations are critical parts of a child's health care plan. The importance and cost-effectiveness of primary and preventive health care are well-documented by the medical community. Preventive health care, early treatment of acute illnesses, and amelioration of chronic illnesses early in life may prevent more costly and personally challenging health problems later. For example, a child who is not screened for hearing loss at an early opportunity is at significant risk for speech and language deficiencies. Similarly, a child who does not receive early blood tests to detect lead poisoning is at risk for inpatient hospitalization, invasive chelation treatment, and subsequent developmental delays or permanent harm. (Rosenberg Trial Tr. at 49:12-53:6; Green Trial Tr. at 543:5-24; Krug Trial Tr. at 283:9-287:9; 305:24-306:9; Jurado Trial Tr. 408:1-415:22.)

68. Children on Medicaid should have a regular source of care, a "medical home" which is accessible and where they will receive additional well-child visits on a timely basis because the pediatrician will encourage them to receive well-child care and instruct them to do so. (Green Trial Tr. at 542:25-543:17, 543:21-24.)

69. If children receive one well-child visit at a medical home, it is more likely that they will receive additional well-child visits on a timely basis because the pediatrician will encourage them to receive well-child care and instruct them to do so. (Green Trial Tr. at 542:25-543:17, 543:21-24.)

70. It is a pediatrician's responsibility to guide parents as to when they should bring their children to the doctor for well-child visits and pediatricians are the experts in providing this guidance to parents. (Green Trial Tr. 557:11-21.)

71. The only records IDPA maintains on the level of care provided to the individual plaintiffs is claims data from providers. In other words, IDPA keeps a child's health history by recording those medical services for which a provider has billed IDPA and IDPA has reimbursed the billing provider. (Rosenberg Trial Tr. at 62:5-63:13; Ryan 7/11/02 Dep. Tr. at 223:24-224:14, 226:4-228:3, 228:17-229:9.) Each reimbursed physician service is called an "encounter." This data is maintained in the IDPA's Medicaid Management Information System ("MMIS"), which contains information on all services and associated payments, as well as information pertaining to the providers and recipients of each service. (Powers Dep. Tr. at 97:12-98:15.)

72. Another computer system, called Cornerstone, collates information about certain tests and immunizations provided to the plaintiffs. The Cornerstone system purports to compile data from IDPA's MMIS as well as the Cook County Department of Health, the City of Chicago Department of Health, and not-for-profit community health agencies. (D. Saunders 7/29/03 Dep. Tr. at 108:10-24; Wrincik Dep. Tr. at 24:6-25:7, 42:6-43:11, 45:14-18, 64:8-17.) Because the Cornerstone system compiles disparate information from so many different organizations, and performs little quality assurance of that data, the information in Cornerstone is not considered reliable. (Darling Trial Tr. at 185:18-188:15; Wrincik Dep. Tr. 26:16-22, 89:3-21.)

73. MMIS and Cornerstone include data from WIC (Women, Infant and Children) clinics (D. Saunders Trial Tr. at 966:14-967:5); Family Case Management (*Id.* at 968:15-969:9); FQHCs (*Id.* at 1125:5-16); Managed Care Organizations ("MCOs") (*Id.* at 1124:13-1125:4); and school-based clinics. (*Id.* at 1226:9-19.)

74. The plaintiffs retained Dr. Thomas Darling ("Dr. Darling") to analyze the MMIS encounter data to determine the level of well-child services, blood lead screens, vision screens and hearing screens that have been provided to the plaintiffs for the period of July 1, 1998 through December 31, 2001 (the "Data Period"). Dr. Darling also analyzed the Cornerstone data as well as the MMIS data for this same period to determine the level of immunizations provided to the plaintiffs. In performing his analyses, Dr. Darling looked at children in Cook County who were both continuously eligible and non-continuously eligible for Medicaid so long as those children were eligible within the age ranges specified in each analysis even if they had a break in eligibility. (Darling Trial Tr. at 129:11-130:12, 131:24-135:18, 171:4-172:14, 169:12-171:3, Pl. Ex. 118, Pl. Ex. 119.)

75. Dr. Darling received his Ph.D. in 1994 from the Rockefeller College of Public Affairs and Policy, State University of New York at Albany. He is on the faculty of The School of Public Affairs at the University of Baltimore in Baltimore, Maryland. Dr. Darling has extensive professional and academic experience in conducting sophisticated analyses of large amounts of data, including working with a variety of state agencies on developing outcome-based performance measures regarding the provision of social services to children. (Darling Trial Tr. at 123:4-129:8, 130:21-131:23, Pl. Ex. 117.)

76. Dr. Darling put all of the MMIS and Cornerstone encounter data into a computerized database using the Microsoft Access computer program. In creating the computerized database, Dr. Darling made adjustments to the database to eliminate data concerning services provided on or after January 1, 2002. In completing both his Expert Report and his Supplemental Report, Dr. Darling did not look at encounter data for the period of January 1, 2002 through August 2002

40

because it was incomplete and, therefore, the results would have been unfairly skewed against the defendants. In his Expert Report, Dr. Darling also adjusted the database to eliminate data for children who were not continuously eligible for Medicaid from July 1, 1998 through December 31, 2001. In so doing, Dr. Darling retained data from 89.7% of the children who were eligible for Medicaid at some point during the data period of July 1, 1998 through December 31, 2001. (Pl. Ex. 119 at Bates No. MO3 000715.) In his Supplemental Report, Dr. Darling reran the analyses of this Expert Report and included the children who were not continuously eligible for Medicaid during the data period of July 1, 1998 through December 31, 2001. Adding in the non-continuously Medicaid-eligible children with continuously Medicaid-eligible children changed the results less than two percentage points. (Darling Trial Tr. at 135:20-142:15, 142:16-155:20, 171:4-180:6, Pl. Ex. 118 at Bates No. MO3 000710-MO3 000716, Pl. Ex. 119 at Bates No. MO3 000205- MO3 000206.)

77. Dr. Darling then analyzed the services provided to the plaintiffs during the Data Period across a broad set of defined age ranges corresponding to the age categories in the EPSDT periodicity schedule to determine the level of service the plaintiffs should have received. For example, the Illinois periodicity schedule states that an infant after leaving the hospital at birth should receive well-child exams at two weeks, one month, two months, four months, six months and nine months. (Pl. Ex. 127, App. 10, at Bates No. 269295.) Dr. Darling analyzed the number of well-child examinations that were received by each child who was between the ages of ten days and eleven months of age during the Data Period to capture these exams. The plaintiffs assumed that all Medicaid-eligible children born in a hospital in Cook County received one EPSDT well-child service before leaving the hospital after birth. Thus, Dr. Darling began this

41

age category at ten days of age in order to factor out any services received in the hospital as part of the birth and postpartum services and he ended at eleven months of age to allow a window of two months to catch the sixth and last scheduled well-child examination (i.e., the exam that should be done at nine months). (Darling Trial Tr. at 142:16-149:4, 171:25-174:6; Pl. Ex. 118, at Bates No. MO3 000716-MO3 000717; Pl. Ex. 119 at Bates No. MO3 000206-MO3 000208.)

78. Dr. Darling performed similar analyses of children in the following age groups: children who were 11 to 23 months of age (to capture the exams that should be given at 12 months, 15 months and 18 months); children who were 23 to 35 months of age (to capture exams that should be given at age two); children who were 35 to 47 months of age (to capture the exams that should be given at age three); children who were 47 to 59 months of age (to capture the exams that should be given at age four); and children who were 59 to 71 months of age (to capture the exams that should be given at age five) during the Data Period. (Darling Trial Tr. at 149:13-155:20, 171:4-14, 174:19-175:20; Pl. Ex. 118 at Bates No. MO3 000718-MO3 000722; Pl. Ex. 119 at Bates No. MO3 000208-MO3 000215.)

79. Dr. Darling also analyzed the number of children who received blood lead screenings, vision screenings, hearing screenings, Haemophilius B (HIB) immunizations, Polio (1PV) immunizations, Diphtheria and Tetanus (DtaP) immunizations, and Measles, Mumps and Rubella (MMR) immunizations. Dr. Darling further analyzed some key age specific services among the full set of required EPSDT services. For example, Dr. Darling analyzed the number of children who received the appropriate number of blood-lead level screens between the ages of 11 and 37 months, and also the number of children who received HIB immunizations between 10 days and 11 months of age. (Darling Trial Tr. at 155:21-165:23, 176:17-190:2; Pl. Ex. 118, at

80. Dr. Darling's analyses show that a majority of Medicaid-enrolled children in Cook County did not receive sufficient medically necessary preventive health care as specified under the Illinois periodicity schedule, and a significant number--one-third or higher--did not receive any preventive health care at all. (Pl. Ex. 118, Pl. Ex. 119.)

81. In performing his analysis of the number of children that received appropriate well-child examinations, Dr. Darling looked at two categories of examinations. The first category consists of examinations in which doctors are required to provide all components of an EPSDT screening (Dr. Darling described these services as "Health Moms Healthy Kids" examinations or "HMHK examinations" because these services satisfy the requirements of the EPSDT program, which is sometimes referred to as "Healthy Moms Healthy Kids" program). The second category includes those services that IDPA counts as "well-child" examinations when responding to CMS-Form 416[12], which includes HMHK examinations as well as other services such as prenatal examinations for pregnant teenagers and exams that last five minutes. (Darling Tr. Transp. at 142:18-144:16; Pl. Ex. 118; Pl. Ex. 119.) This category includes examinations that do not satisfy the requirements of an EPSDT screen, although IDPA has characterized them as meeting the EPSDT screen requirements. (Rosenberg Trial Tr. at 63:5-64:19; Pl. Ex. 72 at Bates No. 278369-278370, Line 6.) Dr. Darling referred to these as "IDPA well-child examinations." Dr. Darling also examined a set of examinations broader than well-child examinations. This third category includes "sick kid" visits. Dr. Darling referred to this category of visits as "any child exams." Thus, "HMHK examinations" are a subset of "IDPA well-child examinations" which in

---

[12]This form will be described *infra*.

turn are a subset of "any child examinations." (Darling Trial Tr. at 143:20-22, 144:2-4; Pl. Ex. 118; Pl. Ex. 119.)

82. Dr. Darling omitted from his analysis services provided in the first ten days of life. His analysis assumed that virtually every baby born in Illinois receives a well-child checkup before being discharged from the hospital. Including those visits in the analysis would not provide an accurate picture of the number of children who receive preventive health care after they leave the hospital postpartum. (Darling Trial Tr. at 144:20-145:15; Pl. Ex. 118; Pl. Ex. 119.)

83. Based on Dr. Darling's analysis, looking at both continuously Medicaid-eligible and non-continuously Medicaid-eligible children, of the Medicaid-eligible children who should have received six screening examinations during this time period, 60.6% received two screening examinations or less, with 43% not receiving a single screening examination. Only 8.25% received the proper level of services. (Darling Trial Tr. at 146:8-149:4, 172:15-174:18; Pl. Ex. 118; Pl. Ex. 119, at Bates No. MO3 000207.)

84. Cornerstone data measures the number of well-child exams received by children enrolled in the IDHS Family Case Management Program. The Cornerstone report shows that 45.3% of children in Cook County had no well-child visits in the first year of life, 16.4% had only one well-child visit, 10.9% had two well-child visits, and only 27.3% had three or more well-child visits. (S. Saunders Trial Tr. at 1219:16-1221:16; Def. Ex. 70 at Bates No. 283340.)

85. According to the Illinois periodicity schedule, children between the ages of 11 months and 23 months should receive three screening examinations: at 12 months, 15 months and 18 months. (Rosenberg Trial Tr. at 60:16-21; Pl. Ex. 127, § HK-203.11 at Bates No.

269187.) Based on Dr. Darling's analysis, of the Medicaid-eligible children who should have received three screening examinations during this time period, 65.3% received one screening examination or less, with 49.7% not receiving a single screening examination. (Darling Trial Tr. at 149:11-152:10, 174:19-175:20; Pl. Ex. 118, Table 2 at Bates No. MO3 000718; Pl. Ex. 119, Table S2b at Bates no. MO3 000209.)

86. According to the Illinois periodicity schedule, children between the ages of 23 months and 35 months should receive one screening examination at 24 months. (Pl. Ex. 127, § HK-203.11 at Bates No. 269187.) Based on Dr. Darling's analysis, of the Medicaid-eligible children who should have received one screening examination during this time period, 64.0% received none. (Darling Trial Tr. at 152:11-153:10, 174:19-175:20; Pl. Ex. 118 Table 3 at Bates No. MO3 000719; Pl. Ex. 119 Table S3b at Bates No. MO3 000210.)

87. According to the Illinois periodicity schedule, children between the ages of 35 months and 47 months should receive one screening examination at 36 months. (Pl. Ex. 127, § HK-203.11 at Bates No. 269187.) Based on Dr. Darling's analysis, of the Medicaid-eligible children who should have received one screening examination during this time period, 64.2% received none. (Darling Trial Tr. at 153:11-154:7, 174:19-175:20; Pl. Ex. 119 Table 4 at Bates No. MO3 000720; Pl. Ex. 119 Table S4b at Bates No. MO3 000212.)

88. According to the Illinois periodicity schedule, children between the ages of 47 months and 59 months should receive one screening examination at 48 months. (Pl. Ex. 127, § HK-203.11 at 269187.) Based on Dr. Darling's analysis, of the Medicaid-eligible children who should have received one screening examination during this time period, 59.8% received none. (Darling Trial Tr. at 154:8-25, 174:19-175:20; Pl. Ex. 118 Table 5 at Bates No. MO3 000721; Pl.

Ex. 119 Table S5b at Bates No. MO3 00213.)

89. According to the Illinois periodicity schedule, children between the ages of 59 months and 71 months should receive one screening examination at 60 months. (Pl. Ex. 127, § HK-203.11 at Bates No. 269187.) Based on Dr. Darling's analysis, of the Medicaid-eligible children who should have received one screening examination during this time period, 54.9% received none. (Darling Trial Tr. at 155:1-20, 174:19-175:20; Pl. Ex. 119 Table 6 at Bates No. MO3 000722; Pl. Ex. 119 Table S6b at Bates No. MO3 000215.)

90. In assessing immunization rates, Dr. Darling utilized all data made available–MMIS data and Cornerstone data. (Darling Trial Tr. at 180:7-183:25; Pl. Ex. 119 at Bates No. MO3 000225-MO3 000227.) Dr. Darling analyzed the Cornerstone data even though he had concerns about its reliability. (Darling Trial Tr. at 185:18-188:15.)

91. According to the Illinois periodicity schedule, children between the ages of 10 days and 11 months should receive three Haemophilus B (HIB) immunizations: at 2 months, 4 months and at 6 months. (Rosenberg Trial Tr. at 61:22-24; Pl. Ex. 27, App. 10 at Bates No. 269295.) Based on Dr. Darling's analysis, 48% of Medicaid-eligible children in Cook County did not receive even one HIB immunization between the ages of 10 days and 11 months. Another 9.6% received only one HIB immunization and 15.2% received only 2 HIB immunizations. Only 27.2% of all Medicaid-eligible children between 10 days and 11 months received the requisite three HIB immunizations. (Darling Trial Tr. at 184:1-185:17; Pl. Ex. 119 at Bates No. MO3 000227-MO3 000229.)

92. According to the Illinois periodicity schedule, children between the ages of 10 days and 5.5 months should receive two polio (IPV) immunizations: at 2 months and at 4 months. (Pl.

Ex. 127, App. 10, at 269295.) Based on Dr. Darling's analysis, the MMIS and Cornerstone data

combined show that 52.3% of Medicaid-eligible children in Cook County did not receive even

one IPV immunization between the ages of 10 days and 5.5 months of age. Another 15.5% of

Medicaid-eligible children in Cook County received only one IPV immunization in the same

time period. (Darling Trial Tr. at 188:16-189:7, Pl. Ex. 119 at Bates No. MO3 000228.)

93. According to the Illinois periodicity schedule, children between the ages of 10 days

and 11 months should receive three diphtheria and tetanus (DtaP) immunizations: at 2 months, at

4 months and at 6 months. (Pl. Ex. 127, App. 10, at Bates No. 269295.) Based on Dr. Darling's

analysis, the MMIS and Cornerstone data combined show that 46.6% of Medicaid-eligible

children in Cook County did not receive even one DtaP immunization between the age of 10 days

and 11 months of age. Another 20.1% of Medicaid-eligible children in Cook County received

only one or two DtaP immunizations in the same time period. (Darling Trial Tr. at 188:16-23;

189:8-13; Pl. Ex. 119 at Bates No. MO3 000229.)

94. According to the Illinois periodicity schedule, children should receive one Measles,

Mumps and Rubella (MMR) immunization, which is due between 12 and 18 months of age. (Pl.

Ex. 127, App. 10, at Bates No. 269295.) Based on Dr. Darling's analysis, the combined MMIS

and Cornerstone data show that 56.6% of Medicaid-eligible children in Cook County did not

receive even one MMR immunization between the ages of 11 and 25 months of age. (Darling

Trial Tr. at 188:16-23, 189:14-17; Pl. Ex. 119 at Bates No. MO3 000229-MO3 000230.)

95. Dr. Darling's analysis shows that despite the fact that Medicaid-eligible children

should receive a blood-lead screening at 12 and 24 months, 77.9% of Medicaid-eligible children

in Cook County between the ages of 11 months and 23 months did not receive a blood lead

screening test. Finally, 60.5% of children in Cook County between the ages of 11 and 37 months did not receive a blood lead screening test. (Darling Trial Tr. at 154:20-158:4, 175:21-176:21; Pl. Ex. 119, Table S7a, b, c, at Bates No. MO3 000216-MO3 000217; Pl. Ex. 127, § HK-203.31 at Bates No. 269192-269193.)

96. Beginning at age three, an objective vision screening, using a standard method, is recommended annually for children between the ages of 3 through 6, and at 8, 10, 12, 15, and 18 years of age, according to the recommendations of the American Academy of Pediatrics ("AAP"). Thus, according to IDPA's Handbook of Providers of Healthy Kids services, children should receive one of their vision examinations at 36 months and another at 48 months. (Pl. Ex. 127, § HK-203.61, Bates No. 269201.) However, the State's data show, for example, that of the Medicaid-eligible children between the ages of 35 months and 47 months who should have received a vision examination during this time period, 97.3% did not receive one. (Darling Trial Tr. at 158:2-159:21, 176:22-177:3; Pl. Ex. 119, Table S8a, Bates No. MO3 000218.) Of Medicaid-eligible children in Cook County between the ages of 47 and 59 months, 95.2% did not receive a vision examination during this time period. (Pl. Ex. 119, Table S8b, Bates No. MO3 000218.) Similarly, of Medicaid-eligible children in Cook County between the ages of 35 and 59 months, 94.2% did not receive a vision screening during this time period. (Pl. Ex. 119, Table S8c, Bates No. MO3 000219.)

97. Objective hearing screening, using a standard testing method, is recommended annually for children between the ages of 4 and 6, and at 8, 10, 15 and 18 years of age, according to the AAP's recommendations. Thus, children should receive one of their hearing examinations at 48 months. (Pl. Ex. 127, § HK-203.62, Bates No. 269295.) Of the Medicaid-eligible children

48

between the ages of 47 months and 59 months who should have received a hearing examination during the time period, 93.6% did not receive one. (Darling Trial Tr. at 159:22-161:2, 177:4-178:25; Pl. Ex. 119, Table S9b, Bates No. MO3 000220.)

98. Dr. Darling's analyses are credible and reliable. His reports are incorporated herein as findings of fact by this court. (Pl. Ex. 118; Pl. Ex. 119.)

99. A standard measure of appropriate immunizations for 19-35 month old children is a vaccination series termed 4-3-1-3 (4 doses DTP, 3 doses polio, 1 dose measles, mumps and rubella and 3 doses HIB.) The 4-3-1-3 series should be completed by 18 months of age. (Rosenberg Trial Tr. at 61:6-21; S. Saunders Trial Tr. at 1157:10-1159:7.)

100. Cornerstone immunization data from August 2003 for Cook County children enrolled in Medicaid shows that less than 40% of these children had completed the 4-3-1-3 vaccination series by 36 months of age. (Joint Ex. 9; D. Saunders 7/29/03 Dep. Tr. at 106:18-108:24.)

101. Pursuant to 42 U.S.C. § 1396(r), IDPA is required to prepare a form known as CMS-416 to report the level of care that children on Medicaid receive. IDPA submits this form annually to CMS. (D. Saunders Trial Tr. at 977:8-23, 981:20-982:18; Pl. Ex. 72.)

102. The CMS-416 shows the number of EPSDT encounters for certain age groups, which include (i) birth to attainment of age one; (ii) age one to attainment of age three; (iii) age three to attainment of age six; (iv) age six to attainment of age 10; (v) age 10 to attainment of age 15; (vi) age 15 to attainment of age 18; and (vii) ages 19 and 20. (Pl. Ex. 72, Bates No. 278368, Line 2a.)

103. The EPSDT encounters that are measured by IDPA as part of its CMS-416 reporting are (i) the total number of initial and periodic screening services received by children, adjusted by the proportion of the year for which they are Medicaid eligible; (ii) the number of unique children receiving at least one well-child examination; (iii) the number of unique children receiving blood-lead screenings; (iv) the number of children receiving preventive dental care; (v) the number of unique children receiving vision screenings; and (vi) the number of unique children receiving hearing screenings. (Pl. Ex. 72, Bates No. 278369-278371, Line 6-6I; Bates No. 278371-278372, Line 9-9I; Bates No. 278374, Lines 14-14F; Bates No. 278373, Line 12b; Bates No. 278375, Line 17; and Bates No. 278375, Line 15; D. Saunders 7/29/03 Dep. Tr. at 244:9-245:12, 247:10-18.)

104. IDPA has prepared instructions on how its staff should compile data to complete the CMS-416 form. Evidence was presented that the IDPA skews the reported data to make it appear as though IDPA's performance is better than it actually is, as set forth below:

a. Under the CMS-416 methodology, IDPA calculates a "screening ratio" for several different age groups: birth to attainment of age 1; ages 1-2; ages 3-5; ages 6-10; ages 11-14; ages 15-18; and ages 19-20. The "screening ratio" is calculated by dividing the total number of well-child screens received by children on Medicaid by the "expected" number of well-child screens. The "expected" number of well-child screens, for purposes of the CMS-416 screening ratio, is the product of (a) the total number of children eligible for EPSDT services, multiplied by (b) the number of well-child screens expected to be received by a child in each age group, multiplied by (c) the average period of eligibility for those children eligible for EPSDT services. This "screening ratio" methodology leads to misleading results because it allows IDPA to count more

50

screens for each child than is indicated by the periodicity schedule, so long as the total number of screens for each child is less than the total number of screens required for the entire period of time in which the child is counted, *e.g.*, a child who is 5 is counted in the 3-5 year-old category and IDPA will count up to three well-child exams per year per child because the Illinois periodicity schedule provides that a child receive 3 well-child exams in the three-year period of ages 3-5. Under the examples posed to defendants' witness Debbie Saunders, she conceded that if the 3-5 year-old group had two children who are continuously eligible for Medicaid throughout a reporting year, and one child received two exams and the other child received no exams in the reporting year, the methodology used by IDPA would show a screening ratio of 100%. (D. Saunders Trial Tr. at 1093:8-1099:4.)

b. IDPA determines a child's age for purposes of deciding which age group to count that child in for purposes of the CMS-416 by looking at his age on September 30, the last day of the federal fiscal year for which IDPA is completing the CMS-416 report. (D. Saunders Trial Tr. at 1101:4-10; Pl. Ex. 72 at Bates No. 278367.) This also overstates IDPA's EPSDT performance. Under the examples posed to Debbie Saunders, she conceded that because the methodology IDPA uses to complete the CMS-416 forms looks at the child's age on September 30, it understates the number of well-child exams that child is expected to receive. For example, a child born on August 1 would be two months old through 13 months old during the fiscal year. IDPA methodology would find that such a child who only received two well-child exams while aged 2 months to 14 months had received 100% of the expected well-child exams because the child is one year old on September 30. The 416 methodology provides that a 1-year-old child should receive two well-child screens. (Pl. Ex. 72 at Bates Nos. 278368-278369, Lines 2a, 2b

and 2c.) That child, however, should receive five well-child exams at 2 months, 4 months, 6 months, 9 months and 12 months. (D. Saunders Trial Tr. at 1101:20-1114:21.)

c. Similarly, the CMS-416 methodology that IDPA uses adjusts the number of well-child exams required by a child who is eligible for Medicaid for less than one full year, and this also leads to results that overstate IDPA's EPSDT performance. Under an example posed to Debbie Saunders, she conceded that when a child is born on January 1 of a year and is eligible for Medicaid for 8 months, IDPA will only look for 4 exams because the child is eligible for only two-thirds of a year and the number of well-child exams is adjusted to show two-thirds of six. (D. Saunders Trial Tr. at 1114:22-1117:14.) However, in such a scenario, the child should receive well-child screens at birth, at two weeks, one month, two months, four months and six months, for a total of six well-child exams pursuant to the Illinois periodicity schedule. (Pl. Ex. 127, § HK-203.11, Bates No. 269187.) Here, a child who received four well-child screens would be considered to have received 100% of required well-child exams even though he did not receive the number set forth on the Illinois periodicity schedule. (D. Saunders Trial Tr. at 1114:22-1117:15.)

105. IDPA also overcounts the number of screening examinations for Medicaid-eligible children. It counts many types of doctor visits that do not and cannot comply with the EPSDT well-child screening criteria, including prenatal visits and brief visits with a nurse lasting only a few minutes. (D. Saunders Trial Tr. at 1119:7-1120:13; Pl. Ex. 72 at Bates No. 298369-278370, Rosenberg Trial Tr. 63:14-64:19.)

106. Although the CMS-416 data that IDPA reports to CMS are statewide, IDPA also breaks out the underlying data for Cook County and for MCOs operating in Cook County. (S.

Saunders Trial Tr. at 1031:17-1034:18.)

107. Even based on Illinois' own CMS-416 Reports (which, as stated above, are overstated), for federal fiscal years 2002, 2001 and 2000, one-third of children in Cook County enrolled in Medicaid did not receive any well-child screening services that are necessary to discover conditions that need corrective treatment. (Pl. Ex. 73, Bates No. 280684, Line 10; Pl. Ex. 74, Bates No. 276725, Line 10; Pl. Ex. 75, Bates No. 276718, Line 10.)

108. Pursuant to data used in completing CMS-416 Reports for federal fiscal years 2000-2002:

a. Over one-half of Medicaid-enrolled children ages 1-5 in Cook County did not receive blood lead screenings. (Pl. Ex. 73, Bates No. 280683 and Bates No. 280686 show that 59,340 children out of 193,665 children in the 1-5 age range received blood lead screenings in federal fiscal year 2002; Pl. Ex. 74, Bates Nos. 276724, Line 1 (for age groups 1-2 and 3-5 shows 189,662 children eligible for EPSDT) and 276729, Line 14.1 (for age groups 1-2 and 3-5 shows 52,558 received lead blood screens); Pl. Ex. 75, Bates No. 276717, Line 1 (for age groups 1-2 and 3-5 shows 179,113 children eligible for EPSDT) and 276722, Line 14.1 (for age groups 1-2 and 3-5 shows 44,115 children received blood lead screens));

b. Approximately 90% of Medicaid-enrolled children in Cook County did not receive a vision screening. (Pl. Ex. 73, Bates Nos. 280683, Line 1 (total of 595,007 children eligible for EPSDT services), and 280687, Line 16A (total of 139,412 unique children receiving vision screens); Pl. Ex. 74, Bates Nos. 276724, Line 1 (total of 580,538 children eligible for EPSDT services), and 276730, Line 16A (total of 75,940 unique children receiving vision screens); Pl. Ex. 75, Bates No. 276717, Line 1 (total of 549,761 children eligible for EPSDT services), and

276723, Line 16A (total of 41,987 unique children receiving vision screens));

c. Approximately 80% of Medicaid-enrolled children in Cook County did not receive a hearing screening. (Pl. Ex. 73, Bates Nos. 280683, Line 1 (total of 595,007 children eligible for EPSDT services), and 280687, Line 15A (total of 122,936 unique children receiving hearing screens); Pl. Ex. 74, Bates Nos. 276724, Line 1 (total of 580,538 children eligible for EPSDT services), and 276730, Line 15A (total of 77,590 unique children receiving hearing screens); Pl. Ex. 75, Bates No. 276717, Line 1 (total of 549,761 children eligible for EPSDT services), and 276723, Line 15A (total of 30,618 unique children receiving hearing screens)); and

d. Approximately 75% of Medicaid-enrolled children in Cook County did not receive a dental screening. (Pl. Ex. 73, Bates Nos. 280683, Line 1 (total of 595,007 children eligible for EPSDT services), and 280685, Line 12B (total of 146,172 unique children receiving dental screens); Pl. Ex. 74, Bates Nos. 276724, Line 1 (total of 580,538 children eligible for EPSDT services), and 276728, Line 12B (total of 160,714 unique children receiving dental screens); and Pl. Ex. 75, Bates No. 276717, Line 1 (total of 549,761 children eligible for EPSDT services), and 276721, Line 12B (total of 146,162 unique children receiving dental screens)).

109. Five MCOs cover Medicaid-enrolled children in Cook County: Amerigroup Illinois, Inc.; Family Health Network; Harmony Health Plan of Illinois, Inc; Humana Health Plan, Inc.; and United Healthcare of Illinois, Inc. Fewer than 20% of the plaintiffs receive care from MCOs. (D. Saunders Trial Tr. at 923:4-15; Kane 12/03/02 Dep. Tr. at 256:2-8.)

110. MCOs are paid by IDPA on a capitated basis–a per member, per month fee for an enrollee based on age and sex. (D. Saunders Trial Tr. at 936:2-22; Werner Trial Tr. at 1057:9-1058:3.) Some MCOs contract to pay their physicians on a capitated basis and those physicians

are not required to submit a claim form detailing services provided to receive payment from the MCO. (Goldsmith Trial Tr. at 507:4-508:14.)

111. Each of the five MCO contracts with the State provides that the MCO shall ensure that all of the children enrolled receive all EPSDT services and, at a minimum, that 80% of all children enrolled received EPSDT services. (Joint Ex. 20.) The State of Illinois is entitled to sanction MCOs for contractual noncompliance. The State has never enforced any provision of the five MCO contracts through available sanctions. (D. Saunders Trial Tr. at 1121:3-1122:5; D. Saunders 5/2/02 Dep. Tr. at 121:16-122:3; D. Saunders 11/26/02 Dep. Tr. at 304:13-305:4, 323:2-18, 320:14-322:24, 323:2-18; Ryan 11/26/02 Dep. Tr. at 373:24-373:23, 374:6-8, 374:14-16, 449:12-451:1, 462:6-9, 472:1-14, 473:20-474:2, 476:14-477:4, 478:22-480:2, 480:19-23; Parker Dep. Tr. at 83:20-22, 169:17-170:23; Carter Dep. Tr. at 66:5-17, 99:20-101:2; Joint Ex. 3-Joint Ex. 7.)

112. MCOs are required by contract to report all services provided to Medicaid recipients as if it were a fee for service (encounter data) to the IDPA. (D. Saunders Trial Tr. at 899:1-3.)

113. Encounter data reported to the IDPA from MCOs must meet the same edits as a fee for service claim, and IDPA rejects much of the MCO encounter data for failing to meet the edits of the claims processing system. (D. Saunders Trial Tr. at 898:15-899:18.)

114. If encounter data from MCOs for an individual is rejected, it is not included in the paid claims file for that individual. (D. Saunders Trial Tr. at 949:18-950:4.)

115. Based on the CMS-416 "participant ratios" for MCOs, the rates for receiving EPSDT services for MCO participants is no better than the rates for receiving care outside of MCOs. Using the CMS-416 methodology, IDPA calculates the "participant ratio." The

numerator in the "participant ratio" is an unduplicated count of those children who received at least one well-child screening during the year covered by the 416 data. The denominator in the ratio is the product of three factors: (a) the number of total Medicaid-eligible children who should receive at least one well-child screening, multiplied by (b) the number of well-child screenings expected to be received by an individual in each age group in one year, multiplied by (c) the average period that each child in the age group was eligible for Medicaid during the year. In federal fiscal year 2002, (a) United Health Care of Illinois had a "participant ratio" for all age groups of .219 (Pl. Ex. 73, Bates No. 280689, Line 10); (b) Amerigroup Illinois had a "participant ratio" for all age groups of .418 (Pl. Ex. 73, Bates No. 280694, Line 10); (c) Family Health Network had a "participant ratio" for all age groups of .550 (Pl. Ex. 73, Bates No. 280699, Line 10); (d) Humana Health Plan, Inc. had a "participant ratio" for all age groups of .226 (Pl. Ex. 73, Bates No. 280704, Line 10); and Harmony Health Plan of Illinois had a "participant ratio" for all age groups of .389 (Pl. Ex. 73, Bates No. 280709, Line 10.)

116. Annually, many of the MCOs prepare reports under the aegis of the National Committee on Quality Assurance ("NCQA"), the MCO credentialing organization. These are commonly known as HEDIS reports. (Ryan 11/26/02 Dep. Tr. at 359:17-360:4, 374:6-8, 374:14-16; 464:21-466:6; D. Saunders 7/29/03 Dep. Tr. at 88:6-21, 94:7-10; 94:20-95:5.)

117. On October 2, 2002, Nelly Ryan, IDPA Division of Medical Programs, wrote the five MCOs that provide services to Medicaid enrolled children in Cook County and outlined each MCO's malperformance in providing well-child exams (based on data used to prepare the CMS-416) and immunizations (based on Cornerstone data) to MCO-enrolled Medicaid-eligible children. Ryan indicated to each of the five MCOs that "from an analysis of the administrative

data set and from the [MCO's] reports of HEDIS measurements and analysis of focused studies, [the MCO] is not yet achieving the participation goals set forth in the MCO contract at Article 5.13 Required Minimum Standards of Care." (Joint Ex. 8; Pl. Ex. 8, Pl. Ex. 12; Pl. Ex. 14; Pl. Ex. 16; Ryan 11/26/02 Dep. Tr. at 372:24-373:23; 374:6-8, 374:14-16, 449:12-451:1, 462:6-9, 472:1-472:14, 473:20-474:2, 476:14-477:4, 478:22-480:2, 480:9-23.)

118. Cornerstone immunization data from August 2003 for each MCO covering children on Medicaid in Cook County show that 60-70% of children enrolled in those MCOs have not completed the 4-3-1-3 vaccination series by 36 months of age. (Joint Ex. 10, Bates Nos. 285242-285244 (Humana Health Plan—only 29.32% of children in the plan had completed 4-3-1-3 shot series by 36 months of age), Bates Nos. 285245-285247 (Americaid Community Choice—only 29.05% of children in the plan had completed 4-3-1-3 shot series by 36 months of age), Bates No. 285248-285250 (Family Health Network—only 37.08% of children in the plan had completed 4-3-1-3 shot series by 36 months of age), Bates Nos. 285251-285253 (Harmony Health Plan—33.32% of children in the plan had completed 4-3-1-3 shot series by 36 months of age), and Bates Nos. 285254-285256 (United Healthcare—27.08% of children in the plan had completed 4-3-1-3 shot series by 36 months of age).

119. Based on data used to prepare the CMS-416 for federal fiscal year 2002, Medicaid-enrolled children in United Healthcare MCO had the following results:

a. Only 22% of children received a well-child screen. (Pl. Ex. 73, Bates No. 280689, Line 10 ("Participation Ratio");

b. Only 28% of children ages 3-20 received a dental screen; of 19,998 Medicaid-eligible children ages 3-20 in United Healthcare (Pl. Ex. 73 Bates No. 280688, Line 1 (total of children in

age groups 3-5, 6-9, 10-14, 15-18, and 19-20)), only 5,536 children received preventive dental services. (*Id.* at Bates No. 280690, Line 12B total of children in age groups 3-5, 6-9, 10-14, 15-18, and 19-20);

c. Only 29% of children ages 1-5 received a blood lead screen; of 5,777 Medicaid-eligible children ages 0-5 in United Healthcare (Pl. Ex. 73 Bates No. 280688, Line 1 (total of children in age groups zero, 1-2, and 3-5)), only 1,166 children received blood lead screenings. (*Id.* at Bates No. 280691, Line 14A (total of children in age groups zero, 1-2, and 3-5));

d. Only 34% of children ages 3-20 received a hearing screen; of 19,998 Medicaid-eligible children ages 3-20 in United Healthcare (Pl. Ex. 73 Bates No. 280688, Line 1 (total of children in age groups 3-5, 6-9, 10-14, 15-18, and 19-20)), only 6,766 children received hearing screens. (*Id.* at Bates No. 280692, Line 15A (total of children in age groups 3-5, 6-9, 10-14, 15-18, and 19-20)); and

e. Only 40% of children ages 3-20 received a vision screen; of 19,998 Medicaid-eligible children ages 3-20 in United Healthcare (Pl. Ex. 73, Bates No. 280688, Line 1 (total of children in age groups 3-5, 6-9, 10-14, 15-18, and 19-20)), only 8,070 children received hearing screens. (*Id.* at Bates No. 280692, Line 16A (total of children in age groups 3-5, 6-9, 10-14, 15-18, and 19-20)).

120. No MCO that has ever contracted with IDPA to provide services to the Medicaid population in Cook County has met the EPSDT requirements in the MCO Contracts. (D. Saunders Trial Trans. at 1007:25-1008:8; Ryan 11/26/02 Dep. Tr. at 372:24-373:23, 374:6-8, 374:14-16, 449:12-451:1, 462:6-9, 472:1-472:14, 473:20-474:2, 476:14-477:4, 478:22-480:2,

480:19-23; D. Saunders 5/2/02 Dep. Tr. at 121:16-122:3; D. Saunders 11/26/02 Dep. Tr. at 309:12-18, 325:2-6, 325:13-17, 334:1-5, 334:11-15, 344:10-345:21; Carter Dep. Tr., 99:20-101:2.)

121. The State uses two documents to describe its Healthy Kids (EPSDT) program to families enrolling in Medicaid. The first is a four-page form, and is called "Healthy Kids: Good Health for Children and Teens" (IDPA Form 1123). (Joint Ex. 23; Lopez Dep. Tr. at 18:22-26:18, 34:1-35:19, 41:11-42:1, 46:7-48:10.) The second document is the KidCare Member Handbook, which is 89 pages long and explains (1) benefits, coverage and responsibilities such as co-pays; (2) premiums; (3) the periodicity schedule for examinations and immunizations; and (4) grievance and appeal forms. (Joint Ex. 11; Carter Dep. Tr. at 139:5-146:4; Longo Dep. Tr. at 91:15-93:14, 93:15-96:4, 96:11-97:21.)

122. Children and their families can apply for Medicaid coverage and be enrolled in three different ways. The documents describing the Healthy Kids Program that plaintiffs receive vary depending on which method they happen to choose. The three application methods are (1) applying for Medicaid benefits through a local IDHS office, either in person or by mail; (2) mailing a KidCare application to the IDPA KidCare central processing unit; or (3) completing a KidCare application with a KidCare application agent who then sends the KidCare application to the IDPA KidCare central processing unit. (Lopez Dep. Tr. at 13:18-14:15, 15:13-21, 18:22-26:18, 34:1-35:19, 41:11-42:1, 46:7-48:10; Ryan 7/11/02 Dep. Tr. at 45:1-46:10, 46:23-47:2, 50:8-51:5; Longo Dep. Tr. at 43:2-46:22, 49:15-52:21, 93:15-96:4.) IDPA uses KidCare application agents to assist applicants for KidCare in applying for coverage (but not in providing assistance in finding care).

123.  Children who apply for Medicaid through the local IDHS office are supposed to be informed by local IDHS staff about the Healthy Kids Program when they apply and be given the four-page Form 1123 entitled Healthy Kids: Good Health for Children and Teens. (Lopez Dep. Tr. at 18:22-26:18, 41:11-42:1; Pl. Ex. 140.)  The State does not provide the KidCare Member Handbook to any of the children and their families who apply at local IDHS offices. (Longo Dep. Tr. at 62:14-24, 63:1-17; Lopez Dep. Tr. at 41:11-42:1; Carter Dep. Tr. at 136:20-24.) Moreover, neither IDHS nor IDPA track or otherwise monitor whether these children and their families are actually told about the Healthy Kids program or receive Form 1123.  (B. Lopez Dep. Tr., 69:19-71:15; N. Ryan 7/11/02 Dep. Tr., 184:22-186:14; K. Carter Dep. Tr., 149:2-21.) There are (a) no policies or procedures in place to govern how such oral notice is to be given, including content and manner; (b) no training manuals relating to advising recipients as to the Healthy Kids program; and (c) no accountability systems to assure that IDHS caseworkers actually give oral notice of EPSDT services/availability.  (Lopez Dep. Tr. at 40:11-41:4, 69:19-71:15; Ryan 7/11/02 Dep. Tr. at 184:22-186:14; Carter Dep. Tr. at 129:14-23, 139:5-146:4; Rodriguez Trial Tr. at 394:1-15.)

124.  Children who apply for KidCare through the IDPA KidCare central processing unit are provided with a copy of the KidCare Member Handbook, but not a copy of Form 1123.  The staff at the IDPA KidCare central processing unit do not have any duty to call persons they enroll in the Medicaid program to orally explain the EPSDT program.  In fact, IDPA has no written policy on how it orally informs children and families of the EPSDT program or the benefits of preventive health care when they are applying for Medicaid through the mail.  (Longo Dep. Tr. at 43:2-46:22, 49:15-52:21, 62:14-24, 63:1-17, 91:15-93:14, 93:15-96:14, 96:11-97:21, 98:7-99:15,

105:13-19; Joint Ex. 11.)

125. KidCare application agents are neither instructed nor required to inform applicants about the specifics of the Healthy Kids program. (Longo Dep. Tr. at 48:18-21, 96:11-97:21, 98:7-99:15; Joint Ex. 11; Joint Ex. 21.) Thus, there is no reason to believe that children and their families who apply for KidCare through KidCare application agents uniformly receive any appropriate oral information about the EPSDT program or the benefits of preventive health care.

126. IDPA Form 1802 is a one-page document sent by the IDHS Central Office annually to all children enrolled in Medicaid to inform them about the EPSDT program. (Admitted, DRFFCL, DRPUF ¶ 257; Joint Ex.18; Joint Ex. 19.)

127. IDPA Form 2286 is sent to children prior to the due date of each periodic examination, as set by the EPSDT periodicity schedule for well-child exams. (Admitted, DRFFCL.) The notice only mentions well-child examinations, not blood lead screens or immunizations. (Pl. Ex. 37; Def. Ex. 76.) The form advises that plaintiffs "may" be due for an exam. (Admitted, DRFFCL; Pl. Ex. 37.)

128. There are no other forms that IDPA or IDHS use to disseminate information to children and families applying for Medicaid about the EPSDT services or the Healthy Kids program. (Carter Dep. Tr. at 139:5-146:4; Longo Dep. Tr. at 96:11-97:21; Lopez Dep. Tr. at 41:11-42:1.)

129. Many Medicaid recipients receive no EPSDT notices at all. (Hannum Trial Tr. at 365:21-23; Craft Trial Tr. at 484:2-11; Mauk Trial Tr. at 218:9-19.)

130. IDPA has not and does not survey or study whether recipients receive automated periodicity notices or whether these notices are an effective way of notifying parents to take their

children to medical providers. (D. Saunders Trial Tr. at 885:16-24; Carter Dep. Tr. at 139:5-146:4, 146:18-148:5, 149:2-21, 151:8-14; Ellinger Dep. Tr. at 84:21-85:7.)

131. IDPA does not evaluate the effectiveness of its notices or brochures as to particular recipients based on those recipients' individual Medicaid usage and history. (Admitted, DRPUF ¶ 274; Carter Dep. Tr. at 151:8-14.)

132. IDPA develops its written EPSDT notices—Forms 1123, 1802, and 2286–in-house. (Admitted, DRPUF ¶ 266; Carter Dep. Tr. at 139:5-146:4; Wyatt Dep. Tr. at 128:6-130:20; Joint Ex. 23; Joint Ex. 18; Pl. Ex. 37.) IDPA does not field test these forms with focus groups or other Medicaid recipient audiences. (Carter Dep. Tr. at 156:14-17.) IDPA also does not use outside linguists in developing or evaluating these materials to ensure that they are readable by persons with limited education, nor does IDPA use cultural experts to develop or evaluate them for people who are illiterate, have limited English proficiency, or limited American cultural literacy. (Wyatt Dep. Tr. at 128:6-130:20; Ellinger Dep. Tr. at 77:16-79:24; 80:1-14.)

133. IDPA has not studied the most effective mix of oral and written material for informing recipients about EPSDT. (Ellinger 7/17/03 Dep. Tr. at 85:18-86:2; Carter Dep. Tr. at 166:19-170:9.)

134. The plaintiffs retained Dr. Timothy Shanahan to analyze the EPSDT notices for readability and understandability by their target audience of Medicaid families in Cook County. (Pl. Ex. 102 (Shanahan Expert Report).) Dr. Shanahan received his Ph.D. in education at the University of Delaware. He is a professor at the University of Illinois at Chicago and director of the UIC Center for Literacy. He has served on and is chairing national panels on literacy and reading, has published 150 articles on these subjects, and has won several awards, including an

award from the International Reading Association for research on document readability. He has substantial knowledge of the literacy of low-income populations in Cook County, the design of documents intended to provide health information to low-income populations in Cook County, and the analysis of documents intended to provide health information to low-income populations in Cook County. Virtually all of his work on designing or analyzing documents has involved target audiences of low-income people in Cook County. (Shanahan Trial Tr. at 559:6-566:4, 570:16-571:18.)

135. Dr. Shanahan opined that the readability of documents used for public health purposes should have difficulty levels of approximately grades four to six. (Shanahan Trial Tr. at 577:5-20, 598:9-16, 602:5-11; Pl. Ex. 102, Bates No. MO3 000176.) He further opined that the State's written methods for informing families about EPSDT services are ineffective because they are too difficult to read for many parents and children. According to Dr. Shanahan, parts of IDPA Form 1123, used to inform families who are enrolling in Medicaid about the Healthy Kids program, are geared to grade seven.[13] (Shanahan Trial Tr. at 590:12-592:25; Pl. Ex. 102, Bates Nos. MO3 000170-MO3 000172.) Dr. Shanahan also stated that the child screening examination and immunization forms included in IDPA Form 1123 are difficult to read. The IDPA Form 2286, a letter sent to parents informing them that their child is due for a checkup, is geared to an eighth-grade reading level and is too difficult to read for many families enrolled in Medicaid.[14] (Shanahan Trial Tr. at 581:1-589:9; Pl. Ex. 102, MO3 000175.) Finally, Dr. Shanahan stated that

[13]Dr. Shanahan analyzed three of the four pages of Form 1123 (he did not analyze the cover page). The pages he looked at are: 244004 (same as Joint Ex. 23, Bates No. 27742), 244005 (same as Joint Ex. 23, Bates No. 277743) and 244006 (same as Joint Ex. 23, Bates No. 277744.)

[14]Pl. Ex. 37, Bates No. 269358 and Def. Ex. 76, Bates No. 277745, are the same notice with different type fonts. Dr. Shanahan analyzed Pl. Ex. 37.

the 89-page manual is even more complex. (Shanahan Trial Tr. at 569:16-570:15.)

136. If health information is especially long, such as 80 pages, or more difficult than the reading competency among the target population, then the best and only way to communicate the information is to combine an oral presentation with the written material. (Shanahan Trial Tr. at 569:16-570:15.)

137. For health-related informational materials targeted to low income populations, the fourth to sixth grade level will successfully communicate to the largest segment of the target population. The higher the grade level, the more challenging the document is for increasingly larger numbers of people. (Shanahan Trial Tr. at 577:5-20, 598:9-16, 602:5-11; Pl. Ex. 102, Bates No. MO3 000176.)

138. In Cook County, any document written at the eighth grade level would present a significant challenge to at least 200,000 people over the age of 25 according to the U.S. census. (Shanahan Trial Tr. at 585:13-24, 587:5-588:12; Pl. Ex. 102, Bates No. MO3 000176.)

139. The IDPA Form 2286, which is the letter sent to parents informing them that their child is due for a checkup, is geared to the eighth grade level and is "much too hard ...[and has] formatting problems ... that would make it even harder." As such, it "would miss a significant portion of, say, the low income population in Chicago." (Shanahan Trial Tr. at 588:14-589:9, 589:12–590:10; Pl. Ex. 102, Bates Nos. MO3 000175-MO3 000176.)

140. As to all of the documents Dr. Shanahan analyzed, he summarized, "My testimony is that these documents are difficult. And if this is the primary way of putting this information out, a significant portion of the population won't understand them." (Shanahan Trial Tr. at 608:4-6; Pl. Ex. 102, Bates No. MO3 000176.)

141. The court finds Dr. Shanahan's testimony and report to be reliable and credible.

142. IDPA and IDHS do not have written policies regarding how to inform applicants or recipients who are blind or deaf about EPSDT, and it has no materials or people to effectively provide the necessary information to these recipients. (Lopez Dep. Tr. at 40:11-41:4.)

143. IDPA and IDHS do not have EPSDT notices in any languages other than English or Spanish. (Admitted, DRFFCL, DRPUF ¶ 278.)

144. IDPA and IDHS do not have any written policies regarding how to inform applicants who do not speak English or Spanish about EPSDT. (Lopez Dep. Tr. at 40:11-41:4.) The State does not translate IDPA Forms 1123, 1802, and 2286 into any languages other than English and Spanish. (Admitted, DRPUF ¶ 278.) IDPA and IDHS have not presented any evidence of any other methods for publicizing the EPSDT program to non-English and non-Spanish speaking populations.

145. IDPA has in the past recognized that in order to get recipients' attention with respect to health care issues, "you have to have multiple methods multiple times." (Longo Dep. Tr. at 106:1-108:17; D. Saunders 7/29/03 Dep. Tr. at 39:23-40:20.) Accordingly, when IDPA has attempted to increase the number of children *enrolled* in the KidCare program, it has used various methods including (i) public service announcements on television and radio; (ii) public presentations at fairs and festivals; (iii) public presentations at community meetings; (iv) grants to community groups to assist in promoting KidCare to hard-to-reach groups or targeted groups such as families in certain ethnic groups, families in rural areas, and families who do not speak English; (v) radio, television, newspaper, and community advocacy directed to African-American families; (vi) radio, television, newspaper, and community advocacy directed at Hispanic and

65

Spanish-speaking families; (vii) sponsorship of events such as the Ringling Brothers Barnum and Bailey Circus; (viii) general advertising radio, newspaper, and bus billboards in the Chicago area; (ix) mass transit advertising; and (x) distribution of KidCare-branded objects such as bookmarks, tattoos, stickers, coloring books, crayons, balloons, pins, and hand fans at fairs. (Admitted in part, DRPUF ¶¶ 230, 231; DUF ¶ 93; Longo Dep. Tr. at 106:1-108:17; D. Saunders 7/29/03 Dep. Tr. at 39:23-40:20.)

146. However, in providing information about EPSDT to those already enrolled in Medicaid, IDPA has not used *any* of these methods. (Carter Dep. Tr. at 166:19-170:9; Ellinger Dep. Tr. at 85:18-86:2.)

147. The State has not issued guidance or instructions to non-primary care medical providers (such as emergency room doctors, hospitals, and specialists) about informing emergency room, acute care or specialty patients about EPSDT services. (Carter Dep. Tr. at 166:19-170:9.)

148. The State does not provide financial incentives for successful referrals of children receiving Medicaid to EPSDT providers. (Admitted, DRFFCL, DRPUF ¶ 304.)

149. Neither IDPA nor IDHS has widely disseminated information regarding the availability of EPSDT and the benefits of preventive health care by outreach activities such as (i) the development of cooperation agreements with local school districts, public health agencies, clinics, hospitals and other health care providers, including developmental disability and mental health providers, or with charities, to notify the constituents of EPSDT; (ii) using the media for public service announcements and advertisements of EPSDT; or (iii) developing posters advertising EPSDT for display in hospital and clinic waiting rooms. (Carter Dep. Tr. at

66

166:19-170:9; Ellinger Dep. Tr. at 85:18-86:2; S. Saunders Dep. Tr. at 238:16-241:4; Lopez Dep. Tr. at 87:13-20.)

150. IDPA provides a general hotline to field all calls from recipients or applicants who may have questions of any kind. (Admitted, DUF ¶ 97.)

151. The hotline manual used to guide the staff who answer hotline calls is over 1,000 pages and contains information on various aspects of the Medicaid program for adults as well as children. (Admitted, DRFFCL, DRPUF ¶ 314.) There was no evidence that hotline operators are trained in any appropriate way to provide this broad range of information. Moreover, the hotline is often understaffed and as a result has had a call abandonment rate as high as 25%. (Carter Dep. Tr. at 162:11-165:4.)

152. For Medicaid recipients who request assistance in finding a doctor, the hotline provides names of doctors "participating" in Medicaid in the caller's zip code. However, IDPA includes in its hotline referral database every doctor who has billed Medicaid for a service even once within the prior 18 months. (Admitted, DRFFCL; Carter Dep. Tr. at 162:11-165:4; Parker Dep. Tr. at 187:15-24.) IDPA does not determine, at the time it gives out the name of a specific doctor, whether that doctor is then taking new Medicaid patients. (*Id.*)

153. Doral Dental Services of Illinois, the administrator of IDPA's dental program, maintains a provider database of dental providers enrolled in the Medicaid program in Cook County. Doral also provides a general hotline for recipients.

154. Doral's network provider database includes dental providers who have not billed Medicaid for a single service within the preceding 30 months. Throughout that 30-month period, that provider's referral status remains as whatever that provider last designated as their referral

status and there is no notation of any inactivity made in Doral's network provider database. (Wiertzema Trial Tr. at 462:12-464:14.)

155. IDPA does not attempt to maintain information regarding the willingness or availability of doctors listed in the hotline database to accept Medicaid patients (Admitted, DRPUF ¶ 324; Luttrell Dep. Tr. at 32:7-33:12; Parker Dep. Tr. at 187:15-24; Carter Dep. Tr. at 162:11-165:4), although more than 60% of the doctors in Cook County who had treated children from July 1, 1998 through December 31, 2001 had not provided a single preventive care service to a Medicaid child. (Pl. Ex. 118, Bates Nos. MO3 000728-MO3 000730; Darling Trial Tr. at 165:24-168:21.)

156. IDPA does not attempt to maintain information regarding the number of Medicaid patients a given provider in the hotline database will accept. (Admitted, DRFFCL, DRPUF ¶ 325; D. Saunders 5/2/02 Dep. Tr. at 195:12-17.) IDPA does not request information from enrolled providers on their availability to accept Medicaid patients. (*Id.*) Physicians will stay on the IDPA hotline referral list as an active provider even if their practice is closed to new Medicaid patients, and even if the practice has turned down Medicaid patients in the past; IDPA does not attempt to keep track of this information. (Luttrell Dep. Tr. at 32:7-33:12; Parker Dep. Tr. at 187:15-24; Carter Dep. Tr. at 162:11-165:4.)

157. IDPA leaves it to the recipient to call individual physicians from the referral list to determine if that physician is accepting Medicaid patients. IDPA does no follow-up to determine whether a recipient who has been given a physician referral through the hotline was able to see that physician or any physician. (Admitted, DRFFCL; Luttrell Dep. Tr. at 32:7-33:12; Carter Dep. Tr. at 162:11-165:4, 166:19-170:9.) In fact, parents of children on Medicaid call many

doctors referred by the hotline and are rejected for treatment because the doctor will not accept Medicaid reimbursement. (Rodriguez Trial Tr. at 394:16-396:11; Mauk Trial Tr. at 356:6-367:14; 358:9-13; 359:16-360:1.)

158. In providing referrals, the hotline staff does not have information about, and does not consider, quality of care issues, such as waiting times for appointments, board certification of physicians, or availability of office hours of physicians. (Admitted, DRFFCL; Parker Dep. Tr. at 208:19-22.)

159. IDHS local office staff is instructed by IDPA policy that they have responsibility for providing assistance to clients in finding physicians and dentists and in scheduling doctor or dentist appointments for children enrolled in Medicaid. (Pl. Ex. 140; D. Saunders 5/2/02 Dep. Tr. at 61:7-62:4.) But IDHS local offices do not have access to any computer database containing names of available physicians to make referrals to children on Medicaid; and IDHS local office staff does not receive training on how to make referrals for children on Medicaid to available physicians. (B. Lopez Dep. Tr. at 16:2-17, 18:22-26:18, 40:11-41:4, 75:19-79:12, 79:18-86:5.) Local offices initially refer clients to the local clinics (the so-called "safety net"), and some of the staff might then look at a written physician list if the person cannot be seen at the clinic. (*Id.*) The doctor list is compiled solely based on the fact that in the past a provider has billed Medicaid for at least one service. (Admitted in part, DRPUF ¶ 344; D. Saunders 5/2/02 Dep. Tr. at 61:7-62:4.) Some IDHS caseworkers are unaware that local offices even have referral books with doctor lists and do not know what to do when asked by recipients for help finding a doctor. (Rodriguez Trial Tr. at 394:9-15.)

160. IDHS local office staff do not have any information regarding the availability of doctors enrolled in the Medicaid program to accept a new Medicaid patient. Local IDHS office staff do not have any information on the specialties nor the board certification status of doctors enrolled in the Medicaid program. (Lopez Dep. Tr. at 18:22-26:18, 75:19-79:12; Rodriguez Trial Tr. at 394:9-15.)

161. IDHS local office supervisors do not check to ensure that IDHS local office caseworkers offer assistance in locating providers, and local IDHS office staff do not keep records of any referrals to physicians that they have made for children on Medicaid. (Lopez Dep. Tr. at 18:22-26:18, 75:19-79:12.)

162. IDHS local offices do not provide the IDPA KidCare Hotline number to clients seeking information about physicians. (Lopez Dep. Tr. at 18:22-26:18, 75:19-79:12.)

163. IDHS local office staff do not have a procedure in place for updating the information on physician referrals contained in the physician binders in the local offices. (Lopez Dep. Tr. at 75:19-79:12.)

164. IDHS local office staff do not call or otherwise communicate with physicians prior to making a referral for a recipient and they do not check with a Medicaid recipient after making a referral to a physician to ensure that the client was able to see that doctor. (Lopez Dep. Tr. at 18:22-26:18, 75:19-79:12.)

165. IDHS local office staff do not keep records on how many or which clients call back after being referred to a physician for another referral. (Lopez Dep. Tr. at 18:22-26:18, 75:19-79:12.)

166. IDHS local office staff also do not have a system for assisting recipients in scheduling appointments with doctors. (Lopez Dep. Tr., 18:22-26:18, 79:18-86:5.)

167. The State neither attempts to identify those Medicaid-enrolled children outside of MCOs who have not received mandated EPSDT services, nor follows up with them to ensure that they do. (Parker Dep. Tr. at 154:2-156:20; Ryan 7/11/02 Dep. Tr. at 266:21-267:5; Luttrell Dep. Tr. at 57:21-58:5; Ellinger Dep. Tr. at 106:14-20.)

168. The State provides case management services to some children through the IDHS Family Case Management program. (Admitted, DRFFCL; admitted in part, DRPUF ¶ 379.) This case management program has limited eligibility and limited enrollment (under 30,000 children were enrolled in May 2003). (DRPUF ¶ 383; Joint Ex. 15; S. Saunders Trial Trans. at 1223:25-1225:22.) The State once operated a case management system in which physicians were paid to manage Medicaid children's care. However, the State discontinued the program although it was popular with doctors who "support[ed] the notion of families staying with them . . . ." (Ellinger Trial Trans., 809:21-810:19.)

169. IDHS also administers a nutrition program–the Women, Infant, and Children program–that encourages immunizations. (Admitted, DRFFCL, DRPUF ¶ 286.) This program also has a limited enrollment. (Admitted, DRPUF ¶¶ 389, 290; Joint Ex. 15; S. Saunders Trial Tr. at 1223:25-1225:22.)

170. The State also administers a few other programs that State witnesses admitted either serve very small percentages of children or provide very limited services such as the Early Intervention Program which refers approximately 12,000 children statewide primarily to non-physician providers and provides no well-child care (S. Saunders Trial Tr. at

1225:23-1226:9); school-based health centers which do not serve children younger than pre-adolescence (*Id.* at 1226:10-15); and Healthy Families and Parents Too Soon which serve less than 4,000 children statewide. (*Id.* at 1226:20-25.)

171. These limited case management programs have had some success in increasing the number of children receiving some EPSDT services. (Joint Ex. 14; Joint Ex. 17.)

172. The State performs no investigation and has no policies directed to whether individual children are actually receiving appropriate care. For example:

a. The State has not evaluated the level or quality of health education being provided by EPSDT providers, including the need for making EPSDT visits. (Admitted, DRFFCL, DRPUF ¶¶ 397, 398.)

b. The State has not evaluated whether EPSDT providers appropriately schedule return EPSDT visits for recipients. (Admitted, DRFFCL, DRPUF ¶ 399.)

c. The State has not studied or evaluated whether geographic, demographic, or ethnographic factors amongst the plaintiffs influence EPSDT usage. (Admitted in part, as to ethnographic factors only, DRFFCL; admitted in part, DRPUF ¶ 402; Ellinger Dep. Tr. at 107:12-108:7.)

d. The State does not follow up to determine why no EPSDT services have been billed as to certain recipients. (Longo Dep. Tr. at 98:7-99:15; A. Kane 6/6/02 Dep. Tr. at 148:3-7, 153:22-154:21, 157:18-158:14.)

e. The State does not engage in outreach efforts to increase the level of EPSDT services received by the great majority of the plaintiffs (Parker Dep. Tr. at 154:2-156:20; Carter Dep. Tr. at 166:19-170:9; Lopez Dep. Tr. at 87:13-20, 88:2-89:20, 91:3-9.)

f. The State does not conduct "chart reviews" to assure that all EPSDT services are being provided to the Children. (Admitted, DRFFCL, DRPUF ¶ 409.)

g. If an invoice from a provider shows that the child did not receive a full EPSDT screen, the State takes no action to determine whether the child is receiving appropriate EPSDT services. (Parker Dep. Tr. at 154:2-156:20.)

h. The State does not require that providers submit any EPSDT reports or other information on the care provided to children; instead, the State relies solely on the invoices for services. (Powers Dep. Tr. at 97:12-98:15.)

i. The State brought forth no evidence that it conducts in-person checks of providers to determine whether they supply the full complement of EPSDT services, nor did the State present any evidence that it checks whether a provider has received appropriate training to deliver the full complement of EPSDT services.

j. The State does not evaluate the quality of EPSDT services provided, or whether providers carry out all EPSDT components. (A. Kane 6/6/02 Dep. Tr. at 149:12-16, 149:22-150:20, 151:8-11, 151:15-18; Werner Dep. Tr., 173:3-8.)

k. The State does not require caseworkers at or after intake eligibility interviews at local offices to inquire whether families and children have regular doctors and to identify possible doctors for families and children who do not have a doctor. (Lopez Dep. Tr. at 18:22-26:18, 75:19-79:12.)

l. The State does not collect survey or other data that would allow the quality of EPSDT services to be evaluated. (A. Kane 6/6/02 Dep. Tr. at 149:12-16, 149:22-150:20, 151:8-11, 151:15-18; Parker Dep. Tr. at 208:19-22.)

m. The State does not pay incentives for providers whose patients receive the full schedule of EPSDT services. (Admitted, DRFFCL, DRPUF ¶ 423; A. Kane 6/6/02 Dep. Tr. at 200:3-7, 200:19-20.)

n. The State does not evaluate whether acute care services received by children receiving Medicaid are related to inadequate receipt of EPSDT services. (A. Kane 6/6/02 Dep. Tr. at 148:3-7, 153:22-154:21, 157:18-158:14; Longo Dep. Tr. at 98:7-99:15.)

o. The State does not evaluate the distribution of information regarding transportation assistance for EPSDT, or its provision of transportation assistance to the plaintiffs, and has not evaluated transportation as a factor in whether recipients will or will not receive EPSDT services. (Lopez Dep. Tr. at 79:18-86:5.)

p. The State fails to assist with scheduling appointments and does not keep records of requests for scheduling or transportation assistance for EPSDT services. (Lopez Dep. Tr. at 18:22-26:18, 79:18-86:5.)

q. The State does not have any quality assurance programs in place so that Medicaid policies such as EPSDT are carried out by other State agencies serving children on Medicaid such as DCFS. The IDPA only reviews other agencies if it hears complaints. (Powers Dep. Tr. at 175:6-176:7.)

173. Children in Cook County must receive prior approval from Dyntek (an IDPA transportation subcontractor) before they can receive any transportation assistance. Dyntek staff make all decisions as to what type of assistance will be provided such as whether a child's medical condition precludes medical transportation by bus. (Pl. Ex. 62; Pl. Ex. 63.)

174. Dyntek does not sufficiently subcontract with Medicaid providers to serve the plaintiffs and thus requests for transportation from hospitals are routinely delayed or are not usable due to tardy or absent transportation providers. (Lopez Dep. Tr. at 79:18-86:5.)

## IV.  Conclusions of Law[15]

### A.  Equal Access

As noted above, 42 U.S.C. § 1396a(a)(30)(A) requires that a state Medicaid plan enlist sufficient providers such that care is available "at least to the extent that such care and services are available to the general population in the geographic area . . . ." Plaintiffs' argument that the defendants have violated this "equal access" provision has three components: (1) the law requires that Medicaid reimbursement rates paid to health care providers be sufficient to provide Medicaid recipients access to health care equal to that of the generally insured population; (2) the arbitrary and capricious manner in which the defendants set reimbursement rates has resulted in rates that are far too low to result in equal access to care; and (3) plaintiffs endure obstacles to finding care not faced by privately insured patients and, as a result, the health problems they experience are both more acute and more preventable.

Prior to trial the court ruled that in determining whether equal access to medical care exists, the relevant population for purposes of this comparison is the insured population and does not include the uninsured. *Arkansas Medical Soc'y, Inc.,* 6 F.3d at 527 ("To suggest that Congress appropriated vast sums of money and enacted a huge bureaucratic structure to ensure that recipients of the federal Medicaid program have equivalent access to medical services as their uninsured neighbors (i.e. close to none) is ridiculous."); H.R. Rep. No. 1010-247, 101st

---

[15]Citations to the Findings of Facts are abbreviated as "FOF."

Cong., 1st Sess. 390 (1989) reprinted in 1989 U.S.C.C.A.N. 2060, 2116 ("compare the access of beneficiaries to the access of other individuals in the same geographic area with *public or private coverage* . . . .") (emphasis added).

In determining whether equal access to medical services exists, at least one court has looked at a variety of factors including (1) the level of reimbursement to participating physicians in the market and the costs of providing such services; (2) the level of physician participation in the Medicaid program; (3) whether there are reports that recipients are having difficulty obtaining care; (4) whether the rate at which Medicaid recipients utilize healthcare services is lower than the rates at which the generally insured population uses those services; and (5) whether defendants have admitted that reimbursement rates are inadequate. *See Clark* v. *Kizer*, 758 F. Supp. 572, 576 (E.D. Cal. 1990) *aff'd in relevant part sub nom, Clark* v. *Coye*, 967 F. 2d 585 (9th Cir. 1992). As will be seen, while these factors are not addressed *seriatim*, nearly all are incorporated into the analysis below.

The starting point for the issue of equal access must be the rates Illinois Medicaid pays to medical providers for providing services to Medicaid patients. Rates and equal access simply cannot be divorced. The Seventh Circuit contemplated as much in *Methodist Hospitals* when it noted that states "may behave like other buyers of goods and services in the marketplace: They may say what they are willing to pay and see whether this brings forth an adequate supply. If not, the state may (and under § 1396a(a)(30), must) raise the price until the market clears." 91 F.3d at 1030. The court in *Methodist Hospitals* made clear that for a state to satisfy the "equal access" provision its rates need only "produce a *result*, not . . . employ any particular methodology for getting there." 91 F.3d at 1030 (emphasis in original). Thus, looking only at the end result of

76

equal access, the court does not consider whether rates are set in an arbitrary and capricious manner. The relevant inquiry, as *Methodist Hospitals* suggests, is whether the rate paid by the IDPA is sufficient to enlist enough providers so that plaintiffs have equal access to medical services.[16] The evidence plaintiffs brought forth in this case, which takes a number of forms, conclusively establishes that the rates paid by the Illinois Medicaid program are insufficient to entice medical providers to provide services to Medicaid patients. These rate payments, along with other considerations discussed below, show that the Medicaid recipients do not have "equal access" to medical services.

The court begins with the expert report and testimony of Dr. Flint. Dr. Flint surveyed the literature published in the medical field and opined that rates paid for providing services to Medicaid-enrolled patients is the factor that most influences a physician's decision whether, and to what extent, to treat Medicaid patients. (FOF ¶¶ 28-29.) Moreover, he researched the amount paid under Medicaid and compared it to rates paid under Medicare and private insurance in Cook County. (FOF ¶¶ 15-20.) Dr. Flint's analysis showed that Medicaid's reimbursement rates are far below those of other payers in the market. (*Id.*) Indeed, his analysis showed that Medicaid, at most, paid 55% of the rate that Medicare paid for the same service. (*Id.*) If Medicaid paid only 55% of the Medicare rate, the Medicaid rate was even a lower percentage of the rates paid by private insurance, which the testimony showed was greater than the rate paid by Medicare. (*Id.*)

---

[16]The case on which plaintiffs rely for the argument that arbitrary and capricious rate setting violates the equal access provision is *Rite Aid of Penn.* v. *Houstoun*, 171 F.3d 842, 852 (3d Cir. 1999). That case expressed disagreement with the Seventh Circuit's approach in *Methodist Hospitals* allowing states to behave like other buyers of goods in setting their market rates. The Third Circuit noted that "[w]e decline to adopt that approach because ordinarily, at least, a state may not act arbitrarily and capriciously, although other actors in the market may do so if they choose." *Id.* at 852. Needless to say, *Methodist Hospitals* is the precedent binding on this court, and that case makes clear that the only relevant inquiry is the result and not the methodology for getting there. 91 F.3d at 1030.

As part of his analysis Dr. Flint also analyzed a physician's cost of overhead, meaning the cost of operating a practice before there is any compensation for the physicians in the practice. (FOF ¶ 19.) Dr. Flint's analysis noted that current Medicaid rates would not even cover a physician's cost of overhead. (*Id.*) Dr. Flint's testimony and his report were persuasive evidence that the rates Illinois Medicaid pays simply do not entice medical providers to participate in Medicaid and, therefore, fails to afford plaintiffs equal access to medical care. If rates are the most important factor in determining whether and to what extent to see Medicaid patients, and if Medicaid pays significantly lower than other payer types, then it follows, as Dr. Flint testified, that insufficient access for Medicaid recipients "should be expected" in Cook County. (FOF ¶ 20.) Dr. Flint's conclusions were not rebutted. The State's expert, Todd Menenberg, did not consider Dr. Flint's analysis and did not present a competing analysis of a doctor's costs to practice or the level of reimbursement rates compared to other payers in Cook County.[17]

Dr. Flint's analysis in his report and his trial testimony were persuasively supported by extensive trial testimony from numerous medical providers. This included testimony from Drs. Rosenberg, Krug, Lelyveld, Jurado, Green, Abelson and Newman. Combined, these doctors serve all portions of Cook County. The doctors each confirmed Dr. Flint's opinions that

---

[17]The court, in a pretrial ruling *in limine*, barred Mr. Menenberg from opining on the level of reimbursement rates at trial for three reasons. First, in his expert report Mr. Menenberg considered the uninsured in his opinion on equal access. As noted above, the appropriate measure of equal access is based on the insured population in the geographic area. Second, Mr. Menenberg only compared Illinois' Medicaid rates to rates set by a selected group of other states. Doctors in Illinois, however, would not consider Medicaid rates set by these other states in considering whether to serve children covered by Medicaid in Cook County. They would, instead, look to what other payers in Cook County are paying. Mr. Menenberg's report also provided no analysis confirming that these other states were, in fact, providing equal access to Medicaid recipients as required under federal law. Finally, while Mr. Menenberg took issue with any comparison between Medicaid rates and Medicare rates, he admitted that he was unaware of how Medicare rates are set. The evidence at trial established that Medicare rates are, in fact, highly relevant in setting rates of all kind, and any opinion to the contrary is based on a misunderstanding of how rates for medical services are established. (FOF ¶ 16.)

reimbursement rates for pediatric care (1) are insufficient to cover overhead costs; (2) result in significant losses for doctors and hospital pediatric departments and clinics with a significant volume of Medicaid patients; and (3) render providers unable to meet the demands of the Medicaid populations they serve. (FOF ¶¶ 19-24, 27, 30-31, 37, 39.)

The doctors' testimony did not relate solely to rates, and numerous other portions of their testimony is persuasive in establishing that plaintiffs do not have equal access to medical care. Testimony showed that Medicaid-enrolled children face conditions such as longer waiting times for care (FOF ¶¶ 41, 50, 53), a more limited population of providers willing to provide care (FOF ¶¶ 47-49), and multiple trips to the doctor for services which could be addressed in one visit. (FOF ¶ 22.) All in all, the doctors painted a picture of Medicaid-enrolled patients being afforded a significantly lesser degree of access to care than that enjoyed by privately-insured children.

Two doctors, Dr. Krug, head of the emergency room at Children's Memorial Hospital, and Dr. Lelyveld, from the University of Chicago hospitals' pediatric emergency room, each testified that Medicaid-insured children do not have access to primary care equal to that of privately-insured patients. (FOF ¶ 60.) Dr. Krug testified that the access of Medicaid-enrolled children is "vastly diminished" and "not remotely close" to that of privately-insured children. (*Id.*)

Drs. Krug and Lelyveld also testified that Medicaid-enrolled pediatric patients are more likely to have no primary care provider than privately-insured patients. (FOF ¶ 51.) Several of the physicians testified that doctors will either not see Medicaid-insured children at all or will significantly limit the number of Medicaid-enrolled children they will accept. (FOF ¶ 47.) All of the physicians testified that when they attempt to refer patients for pediatric specialty care, it is

79

far more difficult to find a doctor willing to accept a referral for a Medicaid-enrolled child than it is for a privately-insured child. (FOF ¶ 49.)

There was also testimony by the physicians that the health problems of children on Medicaid are of a different degree than children with private insurance and are indicative of a population without access to a medical home where they can receive anticipatory guidance, preventive care and early diagnosis. (FOF ¶¶ 32, 50-53.) Dr. Krug testified that Medicaid patients in the emergency room frequently come in with conditions that privately-insured patients do not typically have and which reflect a lack of primary care, including untreated bone fractures or advanced asthmatic conditions. (FOF ¶ 50.) In addition to asthma, Dr. Lelyveld also included gastroenteritis, flu and diabetes as other conditions frequently presented with more aggravated or serious symptoms by Medicaid-enrolled children as a result of lack of primary care. (*Id.*) Indeed, many of the physicians testified that Medicaid children frequently use the emergency room as a source of primary care because they simply have nowhere else to go. (FOF ¶ 52.)

The physicians testifying at trial also brought forth persuasive evidence concerning non-rate factors that would influence a doctor's decision to open his or her practice to Medicaid patients. Dr. Flint noted that these non-rate factors have been dubbed as Medicaid "hassles" in medical literature. (FOF ¶ 22.) Some of these so-called Medicaid hassles are, perhaps, predictable. For example, each physician testified that Medicaid has a very long payment cycle, which was identified as an important factor in determining whether to participate in the Medicaid program. (FOF ¶ 21.) Moreover, many physicians testified that IDPA would arbitrarily reject Medicaid claims and had instituted billing policies and developed forms that served as a disincentive for provider participation. (FOF ¶ 22.) Other Medicaid hassles discussed at trial

ranged from the bizarre to the irrational. Dr. Krug testified that Medicaid had "disenrolled" him from its provider database for no reason, despite the fact that he provides care to thousands of Medicaid-enrolled children every year. (*Id.*) Several other doctors testified that the IDPA refused to pay providers for more than one service per day, regardless of the number of services that a child needs or receives. (*Id.*) As explained in an example by Dr. Krug, "You know, a kid falls off the monkey bar and hits his head, and, you know, that is a concern. He has also lacerated his knee. That needs to be done as well. We can and should bill for both of those services, but we'll only get paid [by Medicaid] for one of them." (Krug. Trial Tr. at 276:19-25.) Defendants have asserted no conceivable medical reason for such a policy, and no argument was or can be made that a similar restriction was encountered by physicians when they seek Medicare or private insurance payments. These hassles provide evidence supporting that a physician would simply choose not to see Medicaid patients rather than deal with the hassles.

The testimony of these doctors was not rebutted and is highly persuasive in establishing the level of access provided to Medicaid recipients. Defendants, in response to this testimony, argue that it only establishes that medical professionals want higher reimbursement rates from the IDPA. To the extent that this argument suggests that the witnesses were biased and, therefore, that the court should place little weight on their testimony, such argument is rejected. The court observed the testimony of these doctors and did not notice even a hint of bias. Each doctor was a highly trained medical professional who had dedicated his life to the provision of medical services to children. Their testimony made abundantly clear that their interest was in the health and well-being of children.

The testimony of the medical providers, along with Dr. Flint's expert report and trial testimony, was corroborated by evidence presented by certain Medicaid recipients. Six Medicaid recipients testified at trial as to their actual experiences attempting to find primary care doctors or specialists who accepted Medicaid for their children. None of these witnesses were able to access medical care in a manner equal to that of the generally-insured population. (FOF ¶¶ 53-55.) Several of the witnesses were in the unique position of being able to compare their experiences in finding doctors to treat their children covered under Medicaid with their experiences finding doctors to treat their children covered under private insurance. (FOF ¶ 55(e), (f) & (g).) As these witnesses testified, obtaining medical services for their children covered under private insurance was not a difficult task, while attempting to obtain care for their children covered under Medicaid was a much more difficult and frustrating process. (*Id.*) These witnesses also testified in detail that State programs designed to provide assistance for finding doctors were unhelpful and they were not able to locate doctors on their own. (FOF ¶¶ 53, 54, 55(a) & (b).)

Once again, the defendants have not effectively rebutted any of the above evidence. As plaintiffs point out, the defendants have no knowledge regarding the state of access for Medicaid-enrolled children in Cook County and have never tried to learn what the level of access might be. Employees of the IDPA freely admit that rates are low and not very attractive and are set without regard to the effect such rate-setting will have on access, even though they acknowledge that an increase in rates would increase the number of providers who would participate in the Medicaid program. (FOF ¶¶ 10, 56, 57, 59.) At trial there was evidence presented of the raw number of providers who are "enrolled" in Medicaid, but the court agrees with plaintiffs that this does not

82

establish equal access. All a provider needs to do to become enrolled is to fill out a form. (FOF ¶ 45.) There is no obligation to treat even a single Medicaid patient and the provider would remain enrolled so long as he or she billed Medicaid once for a service over an 18-month period. (FOF ¶ 152.) These very same doctors that may have enrolled in Medicaid may be unwilling to accept new Medicaid patients or may have stopped seeing Medicaid patients entirely within the last 18 months.

Contrary to this analysis of raw numbers of providers enrolled in Medicaid, plaintiffs presented an analysis by Dr. Darling which attempted to analyze how many doctors provide a service (specifically well-child examinations) to Medicaid-enrolled children in Cook County. Dr. Darling first looked at all doctors who billed at least one service of any kind for a Medicaid-enrolled child during the three and one-half year period from July 31, 1998 to December 31, 2001. (FOF ¶ 74, 76.) He determined that 10,494 doctors billed IDPA for at least one service provided to a Medicaid-enrolled child in Cook County between the ages of 10 days and 18 years, and 7,131 doctors billed IDPA for a service provided to a child between the ages of 10 days and 7 years. (FOF ¶ 46.) Dr. Darling's analysis also showed that over a 3½ year period more than half of these doctors never provided even a single well-child examination and that the vast majority of well-child services are billed by only a very small minority of the doctor community. (*Id.*) As this analysis suggests, only a small subset of doctors provide significant levels of well-child services to plaintiffs and reliance on the enrolled doctors as an indicator of access to care creates an overstated picture.

While the court will address below in the EPSDT portion of this opinion Mr. Menenberg's disagreements with Dr. Darling's methodology, for purposes here Mr. Menenberg

did not undercut Dr. Darling's analysis. In fact, Mr. Menenberg's analysis supports Dr. Darling's conclusions in this regard. Dr. Darling analyzed mainstream providers of medical care while Mr. Menenberg also included "safety net" care provides such as FQHCs and public health clinics. Under Mr. Menenberg's analysis there were 11,767 providers who had provided a well-child examination in the relevant time period using the broader IDPA definition of a well-child exam (only 4,266 provided an HMHK exam). (Def. Ex. 1 at 19-22.) According to Mr. Menenberg, based on this number of providers, each provider would have to serve "approximately 87 children" which, in his estimation, gives plaintiffs sufficient access to medical care. But Mr. Menenberg also showed that more than half of all these providers serving Medicaid-enrolled children in Cook County have served 10 or fewer unique Medicaid-enrolled children. (*Id.*) This confirms exactly what Dr. Darling stated, that most services are being provided by a small subset of providers. Certainly each provider as Mr. Menenberg defined that term was not seeing 87 children.

Moreover, the court also takes issue with the inclusion of these so-called "safety net" providers in the equal access analysis. The inquiry is, after all, of *equal* access and not simply of access. The plaintiffs are entitled to the same level of medical care as is provided to children covered under private insurance. That must include mainstream medical care. Evidence at trial established that children need a medical "home" where they can be provided regular and ongoing services. (FOF ¶¶ 32, 68.) Also, in certain instances parents of children need access to their physician on nights or weekends. (FOF ¶ 42.) Such services simply cannot be provided by these safety net providers. Indeed, the evidence further showed that these FQHCs and public health clinics have long lines which, in some instances, may place patients in danger. (FOF ¶¶ 41, 50,

53.) That, according to several doctors, often results in patients coming to the emergency room seeking treatment for primary care. (FOF ¶¶ 52-53.) Since the plaintiffs are entitled to access equal to that of children with private insurance, the appropriate measure must be that of mainstream medical care that privately insured children are likely to receive.

Wherefore, based on the entire record, the court finds that the plaintiffs have met their burden of establishing that the defendants have violated their rights by failing to provide them with equal access to medical services. Plaintiffs simply do not have access to medical services which is equal to that of privately insured children.

## B. EPSDT Provisions

The plaintiffs' claims under the EPSDT provisions take two parts. First, they allege that the defendants have failed to make "effective" efforts to inform them about the EPSDT program. Their second theory is that the defendants have failed to connect children to EPSDT services and have failed to establish a Medicaid program designed to provide all such services to all Medicaid-enrolled children on a timely basis.

## 1. *Effective efforts to inform*

Under 42 U.S.C. § 1396a(a)(43)(A), a state Medicaid plan must provide for the informing of all persons under the age of 21 who are eligible for Medicaid of the availability of the EPSDT services described in 42 U.S.C. § 1396d(r) and of the need for age-appropriate immunizations against vaccine-preventable diseases. The defendants must provide for a combination of written and oral methods and must "effectively" inform all EPSDT eligible individuals (or their families) about the EPSDT program. 42 C.F.R. § 441.56.

Once again, the plaintiffs' proof in support of their argument that they have not been informed of the availability of EPSDT services and immunizations takes several different forms. The court begins with the testimony of the IDPA employees, who described many of the IDPA's procedures and practices with regard to informing Medicaid recipients of EPSDT services.

Initially, these employees documented the different ways a child can be enrolled in Medicaid and the different notices and information provided under each method of enrollment. For example, the first method under which a child may enroll in the Medicaid program is to apply through their local IDHS office. (FOF ¶ 122.) At this time the recipients are supposed to be informed orally by local IDHS staff about the Healthy Kids Program (which, as noted above, is the Illinois EPSDT program, *see* FOF ¶ 65) and are to be given IDPA Form 1123, entitled Healthy Kids: Good Health for Children and Teens. (FOF ¶ 123.) These recipients who apply at local IDHS offices are not provided the 89 page KidCare Handbook. (FOF ¶¶ 122-23.) Neither the IDPA nor the IDHS have (1) any policies or procedures in place to govern how oral notice is to be given to these recipients, including the content and manner of such notice; (2) any training manuals relating to advising recipients as to the Healthy Kids program; and (3) any accountability system to assure that IDHS caseworkers actually give oral notice of EPSDT services. (FOF ¶ 123.)

A second method for enrollment in the Medicaid program is by mailing a KidCare application to the IDPA KidCare central processing unit. (FOF ¶ 122.) A recipient who chooses this method for enrollment will be provided a copy of the 89 page KidCare Handbook but not IDPA Form 1123. (FOF ¶ 124.) Moreover, staff at the IDPA KidCare central processing unit do not have any duty to call persons they enroll in the Medicaid program to orally explain the

EPSDT program. (*Id.*) IDPA has no written policy on how it orally informs children and their families of the EPSDT program or the benefits of preventive health when they are applying through the mail. (*Id.*)

Finally, a recipient may be enrolled in the Medicaid program by completing a KidCare application with a KidCare application agent who then sends the KidCare application to the IDPA KidCare central processing unit. (FOF ¶ 122.) KidCare application agents are neither instructed nor required to inform applicants about the specifics of the Healthy Kids program. (FOF ¶ 125.) There was no evidence presented that children and their families who apply for KidCare through KidCare application agents uniformly receive any appropriate oral information about the EPSDT program or the benefits of preventive health.

Also related to the issue of EPSDT notices are IDPA Forms 1802 and 2286. Form 1802 is a one-page document sent by the IDHS Central Office annually to all children enrolled in Medicaid to inform them about the EPSDT program. (FOF ¶ 126.) Form 2286 is sent to children prior to the due date of each periodic examination as set by the EPSDT periodicity schedule for well-child examinations. (FOF ¶ 127.) This notice only mentions well-child exams and not blood lead screens or immunizations. (*Id.*) It advises plaintiffs that they "may" be due for an exam. (*Id.*) Neither IDPA nor IDHS disseminate information about the Healthy Kids program to children and families applying for Medicaid using any other forms. (FOF ¶ 128.) Many Medicaid recipients never receive any of these EPSDT notices at all. (FOF ¶ 129.) IDPA has not surveyed and does not study whether recipients receive automated notices or whether these notices are an effective way of notifying parents to take their children to medical providers. (FOF ¶ 130.) IDPA develops all of its written EPSDT notices in-house and does not field test

these forms with focus groups or other Medicaid recipient audiences. (FOF ¶ 132.) IDPA also does not use outside linguists in developing or evaluating these materials and has not studied what the most effective mix of oral and written material for informing recipients about EPSDT services would consist of.[18] (FOF ¶¶ 132-33.)

Plaintiffs supplemented this testimony from the IDPA employees with testimony and an expert report from Dr. Timothy Shanahan. Dr. Shanahan was retained to analyze the EPSDT notices sent by IDPA for readability and understandability by their target audiences in Cook County. Dr. Shanahan opined that the readability of documents used for public health purposes should have difficulty levels of approximately grade four to six. (FOF ¶ 135.) His opinion was that the IDPA's written methods for informing families about EPSDT services are ineffective because they are too difficult to read for many parents and children. (FOF ¶¶ 135-140.) He summarized by noting, "My testimony is that these documents are difficult. And if this is the only way of putting this information out, a significant portion of the population won't understand them." (FOF ¶ 140.) Dr. Shanahan noted that when documents are especially long, or when more difficult than the reading competency among the target population, the best and only way to communicate the information is to combine oral presentations with the written material. (FOF ¶ 136.)

---

[18]On a related note, plaintiffs also offered evidence concerning the methods the defendants used to provide assistance to Medicaid recipients. As this evidence shows, these methods were ineffective. The parents of Medicaid enrolled children testified that the physician referral hotline administered by IDPA gave out referrals to physicians who were not even accepting Medicaid patients. (FOF ¶ 55(a), (b) & (e).) Employees of IDPA testified that they do not investigate the capacity of physicians on the referral list to accept new patients nor do they confirm whether the physicians are even still participating in the Medicaid program. (FOF ¶¶ 152, 155-164.) The local offices administered by the IDHS, which serve as the primary personal contact that Medicaid recipients have with the state agencies, are staffed with caseworkers who offer no assistance in referring recipients to doctors. (FOF ¶¶ 159-60.)

Finally, plaintiffs also argue that the results of the EPSDT program, which will be discussed more fully below, illustrate that defendants have not effectively informed them of the EPSDT services. If, plaintiffs argue, the defendants were effectively notifying them of the availability of EPSDT services, then the level of services should have been much higher than it actually turned out to be.

Weighing all of the above evidence, the court finds that plaintiffs have supplied sufficient proof showing that the defendants have not effectively informed them of the availability of EPSDT services. As the evidence showed, IDPA provided differing forms of information depending on the manner in which a recipient applied for benefits, with no apparent reason for the differences. Even when IDPA has a policy of providing oral notice to recipients, there is no practice for ensuring that such notice is effectively given and no training to suggest what effective oral notice entails. The written EPSDT notices provided by IDPA only mention well-child examinations and omit notice of lead-blood screens or immunizations. Furthermore, as the evidence at trial showed, these notices are often not received (indeed, there was no testimony from any recipient that they had in fact received such EPSDT notices) and IDPA has never bothered studying whether these notices reach their intended audience or whether they effectively convey information about the availability of EPSDT services.

Moreover, the court finds the Expert Report and testimony of Dr. Shanahan persuasive. While defendants take issue with many of his opinions, the central premise of his testimony and report is clear. Public health documents such as those provided by defendants are often difficult documents from a readability and understandability standpoint. Informing families of EPSDT services solely on the basis of the documents provided by IDPA would be ineffective and would

miss a significant portion of the target population. Thus, to effectively inform Medicaid recipients such written materials need to be supplemented by oral presentations. It is difficult for IDPA to refute this contention insofar as it has recognized as much in other scenarios. IDPA employees have stated that to attract recipients' attention "you have to have multiple methods multiple times." (FOF ¶ 145.) Moreover, when IDPA attempted to increase the number of children *enrolled* in the KidCare program, IDPA used a wide variety of methods such as public service announcements, public presentations at fairs and festivals, public presentations at community meetings, grants to community groups, radio, television, newspaper and community advocacy directed to African-American and Hispanic families, sponsorship of events such as a circus and general advertising through radio, newspaper, bus billboards, mass transit advertising and distribution of bookmarks, coloring books, crayons and other items at fairs. (*Id.*)

None of these methods have ever been used to inform recipients of the availability of EPSDT services. Instead, the IDPA provides different information depending on how one applies. Only under one method of application is oral guidance even supposed to be given, but no one can say how often it is given or whether it is at all. IDPA's method for informing recipients that services are due is simply to mail out notices, the readability of which has never been determined. IDPA further has no idea whether these notices reach the recipients or, if they do, whether they are even considered. This, simply put, is not effective notice of the availability of EPSDT provisions. As will be seen below, the ineffectiveness of this notice shows up in the number of EPSDT services that plaintiffs actually receive.

90

## 2.    *EPSDT services*

The Medicaid Act requires states to provide Medicaid-enrolled children with certain medical services, including well-child examinations and immunizations, known as EPSDT services. *See* 42 U.S.C. § 1396d(r). In addition, the Medicaid Act further requires that states provide any follow-up or corrective services that may be necessary based on the results of any EPSDT screenings. *See* 42 U.S.C. § 1396a(a)(43)(C). These EPSDT requirements differ from merely providing "access" to services; the Medicaid statute places affirmative obligations on states to assure that these services are actually provided to children on Medicaid in a timely and effective manner. *See, e.g., Stanton* v. *Bond,* 504 F.2d 1246, 1250 (7th Cir. 1974) ("The mandatory obligation upon each participating state to aggressively notify, seek out and screen persons under 21 in order to detect health problems and to pursue those problems with the needed treatment is made unambiguously clear by the 1967 act and by the interpretative regulations and guidelines."). Significantly, plaintiffs do not suggest that the inquiry is whether or not some children receive EPSDT services. Certainly some do, and it would be unrealistic to hold the IDPA liable for not providing EPSDT services to every single child. Instead, plaintiffs' theory is that the IDPA has not established a Medicaid program designed to provide all EPSDT services to all Medicaid-enrolled children on a timely basis. Based on the evidence received at trial, the court agrees.

The Medicaid Act requires states to adopt a "periodicity schedule" for screening services that "meets reasonable standards of medical and dental practice" and sets forth the stages at which recipients should receive such services. *See* 42 U.S.C. § 1396d(r)(1)-(4); 42 C.F.R. § 441.58. IDPA has adopted a periodicity schedule based on the recommendations of the

American Academy of Pediatrics that incorporates the nationally recognized schedule for immunizations, and calls for seven appointments for well-child screenings in the first year of life, with a decreasing number of annual appointments as the child becomes older. *See* 89 Ill. Admin. Code § 140.488.

Nearly everyone involved in this case on the defendants' side has declared, practically in unison, that the periodicity schedule is but a "recommendation." No witness for the defendants explained in great detail what this means. The court understands defendants to be suggesting that because, in their mind, the periodicity schedule is only a so-called "recommendation," it is acceptable if plaintiffs are not afforded all of these services. There is no basis for such a belief. While the American Academy of Pediatrics may have recommended a certain schedule for well-child screenings and immunizations, federal law requires states to adopt a periodicity schedule that meets reasonable standards of medical and dental practice. *See* 42 U.S.C. § 1396d(r)(1)-(4). In conformance with federal law, the State of Illinois adopted the recommendations of the American Academy of Pediatrics for the number and timing of well-child examinations. This periodicity schedule, therefore, is a required component of Illinois' EPSDT program. Any suggestion that it serves as a "recommendation" or that children need not be provided all such services is simply baseless.

States are required under the Medicaid Act to maintain data on EPSDT services provided to Medicaid-enrolled children. *See* 42 U.S.C. § 1396a(a)(43)(D). The primary source of data the State of Illinois uses to measure the EPSDT services provided to children is the "paid claims" data maintained within IDPA's MMIS database. Regarding immunizations, IDPA also maintains a separate data system known as Cornerstone, which attempts to capture immunization services

provided through various public health agencies. MMIS and Cornerstone are the defendants' best-available resources for determining the medical services provided to the Medicaid-enrolled children and are used by the defendants (1) for their own internal analyses of the care provided; (2) for analyzing the performance of contractors such as MCOs; and (3) for reporting requirements to the federal government.

The data contained in these databases was analyzed by Dr. Darling in both his original Expert Report and Supplemental Report.[19] He adjusted the data he was given to limit his analyses to services provided during the period of July 1, 1998 to December 31, 2001 (the "Data Period"). (Pl. Ex. 118 at 4-6.) Exclusions made within the data given to Dr. Darling were explained in his report. For example, to limit the entries to the Data Period he was examining, Dr. Darling deleted eligibility records for recipients (1) who were born after December 31, 2001; (2) who were first eligible for Medicaid after December 31, 2001; and (3) with certain anomalous records where an eligibility date preceded the recipient's date of birth. *Id.* These adjustments reduced the number of unique recipients from 957,710 to 910,451. (*Id.*) Dr. Darling deleted those entries with a date of service after December 31, 2001 and all service records for which no

---

[19]Discovery in this case can best be described as a difficult process. In August 2002, the defendants provided the plaintiffs the data from MMIS. The defendants represented in their discovery responses that the data consisted of "all encounter data for children involved in this action." (Pl. Ex. 116, Ex. B.) This representation was never amended by the defendants. Dr. Darling performed his analysis based on this data and prepared his original report. That report was tendered to the defendants on March 3, 2003. In June 2003, the defendants tendered Mr. Menenberg's report to the plaintiffs. Mr. Menenberg's report analyzed not only the MMIS data but also additional data from the IDHS Cornerstone database. The Cornerstone data, however, was not provided to the plaintiffs until May 30, 2003, more than 45 days after the defendants provided this data to Mr. Menenberg, three months after Dr. Darling completed his initial report and about two weeks before the defendants turned over Mr. Menenberg's report. Indeed, as one of his critiques of Dr. Darling's analysis, Mr. Menenberg asserted that Dr. Darling's analysis was flawed because it did not take into account the Cornerstone data, which neither Dr. Darling nor the plaintiffs had even been provided. Plaintiffs were granted leave by Magistrate Judge Martin Ashman to supplement Dr. Darling's analysis to account for this Cornerstone data and to address other criticisms made by Mr. Menenberg. Both Dr. Darling's original Expert Report and his Supplemental Report were accepted into evidence at trial.

matching recipient could be found in the adjusted eligibility data. (*Id.* at 6.)

In his initial report, Dr. Darling also adjusted the data to limit his analyses to services provided to recipients who were continuously Medicaid-eligible during the time periods he analyzed. (*Id.* at 6-8.) Dr. Darling explained that he did this for two reasons. First, he stated that the State had more limited opportunities to provide services to non-continuously eligible children and, second, because these recipients could have received unrecorded services while not covered under Medicaid. (*Id.* at 6-8.) This adjustment reduced the number of recipients analyzed from 910,451 to 818,019, a reduction of just under 10%. (*Id.*) In response to Mr. Menenberg's criticism of this continuously-eligible limitation, in his Supplemental Report Dr. Darling later reran his analysis including all 910,451 recipients and his overall results were very similar. (Pl. Ex. 119.)

Significantly, through his analysis Dr. Darling set out to determine the level of services that had been provided to Medicaid-enrolled children in Cook County on a timely basis. Therefore, he established age ranges in order to capture whether or not services were being provided to the plaintiffs in accordance with the Illinois periodicity schedule. For example, according to the periodicity schedule a child should receive 6 screening services after leaving the hospital and prior to one year of age (at 2 weeks, 1 month, 2 months 4 months, 6 months and 9 months). To evaluate the extent to which such services were actually received, Dr. Darling analyzed the services given to children between the ages of 10 days and 11 months.[20] Similarly, to evaluate whether children were receiving appropriate screenings services due at 12 months, 15

---

[20]Dr. Darling explained why his analysis was limited to children between the ages of 10 days and 11 months. This limitation is discussed in FOF ¶¶ 72 and 82.

months and 18 months, Dr. Darling analyzed services received by children between 11 and 23 months. Dr. Darling conducted additional analyses of the well-child services provided to Medicaid-enrolled children in Cook County through age five.

Based on this methodology, Dr. Darling showed that more than half of the children between 10 days and 11 months, who should have received six screening services, received none. Even under the IDPA's broader definition of a "well-child" examination, which includes a five-minute exam with only a nurse, Dr. Darling showed that approximately 45% of children received no well-child exams during this period. In addition, nearly 60% of children between the ages of 11 and 23 months received zero well-child exams, and over 70% received zero well-child exams between 23 and 35 months and between 25 and 47 months.

In his Supplemental Report, Dr. Darling added the non-continuously eligible recipients. Concerning well-child exams, adding these non-continuously eligible recipients yielded only negligible changes of no more than 2%. (Pl. Ex. 119 at 2-20.) In his Supplemental Report Dr. Darling also re-analyzed immunization data to include information from the Cornerstone database. With this data included, the records showed that with respect to every immunization analyzed, roughly 50% or more of the eligible recipients had not received a timely immunization. (Pl. Ex. 119 at 21-26.)

In addition to the testimony and reports of Dr. Darling, the plaintiffs also looked at Cook County-specific reports prepared by the State showing the number of EPSDT services provided to children. These Cook County-specific reports are prepared in the same manner and with the same data as the statewide CMS-416 reports submitted to the federal government under 42 U.S.C. § 1296a(a)(43)(D).

The methodology used in creating these reports overstates the actual level of EPSDT services provided. For example, for purposes of the CMS-416 forms IDPA counts many types of doctor visits that do not and cannot comply with EPSDT well-child screening criteria, including short visits where a patient may not even see a doctor. (FOF ¶ 105.) These reports also count well-child exams received by children far in excess of the number of exams required under the Illinois periodicity schedule (FOF ¶ 104(a)), and use a cut-off date of September 30 to establish a child's age, even though this makes it seem as though a child has received all of his or her screens when he or she may have received less than half of them. (FOF ¶ 104(b) & (c).)

Even though overstated, the Cook County specific reports show that the level of EPSDT services provided to children are inadequate. These forms show that for the years 2000 through 2002, approximately one-third of Medicaid-enrolled children in Cook County did not receive any well-child screening services and 75% did not receive a dental screening. (FOF ¶¶ 107-08.) Based on this data, IDPA notified the MCOs providing services to children in Cook County that each was failing to meet the participation requirements set forth in their contractual "minimum standard of care." (FOF ¶¶ 109, 117.)

In response to this evidence, the defendants (1) attempt to impugn the very data they tendered in discovery and which they submit to the federal government and (2) rely on Mr. Menenberg's critiques of Dr. Darling's methodology. Concerning argument (1), according to defendants, the "paid claims" used in MMIS and Cornerstone databases underreport the number of services provided to the plaintiffs. Because the data are underreported, defendants submit that Dr. Darling's analyses must be flawed. For example, defendants argue (a) that encounter data may not be submitted by physicians to particular MCOs and, therefore, may not be submitted to

the IDPA; (b) that large numbers of MCO encounter data may be rejected by the IDPA because the encounter data does not meet the edits of the claims processing system; (c) that because FQHCs billings are based on an encounter rate, which includes all services provided to a child for that day, and because the services on the encounter line are often limited to one service, the FQHCs do not provide an accurate measure of the services a child received during a visit; and (d) that other providers in IDPA's provider network provide services to Medicaid eligible children but may or may not bill for these services or may or may not list all services provided in a particular encounter.

These arguments are unpersuasive. Initially, most are based only on speculation. No witness with direct personal knowledge testified as to the operation of the entities the defendants claim provide services to Medicaid-enrolled children but do not bill or otherwise report such data to IDPA. In fact, much of the evidence showed that the types of entities defendants discuss do bill the IDPA for services they provided and were, therefore, analyzed by Dr. Darling. Exhibit 12 to Mr. Menenberg's report sets forth a list, derived from the State's MMIS data of providers that provided EPSDT services, that includes FQHCs, encounter rate clinics, health departments and school based/linked health clinics.

Moreover, with regard to FQHCs, no witness verified or even testified that FQHC's might perform two or more well-child services but only provide the procedure code for one. Testimony showed that FQHCs bill for each encounter according to a CPT-code, and there is no evidence to support the speculation that if the FQHC was providing a well-child examination, it would not identify the appropriate CPT-code for that encounter.

As for the MCOs, which serve less than 20% of the plaintiffs, defendants argue that because doctors are normally paid on a capitated basis, they would have no incentive to record each service they provided to the plaintiffs. No evidence was presented on how to estimate or quantify such a purported understatement, and the defendants acknowledged that their contracts with the MCOs require that MCOs bill for every encounter. (FOF ¶ 112.) Moreover, only a portion of the doctors enrolled in MCOs are paid on a capitated basis. (FOF ¶ 110.) Thus, in essence, the defendants argue that only some fraction of those doctors fail to bill appropriately. This evidence is simply unpersuasive.

With regard to public health clinics and school-based clinics, once again no witness testified concerning the billing practices at such clinics or whether underbilling of services would exist. Instead, Mr. Menenberg's report shows that public health clinics and school-based clinics do bill IDPA for services provided and their billing information is in the MMIS data.

Finally, and more fundamentally, Dr. Darling's analysis provides the opportunity to examine the actual level of the shortfall in the number of services that should have been provided to the plaintiffs and whether, realistically, those services could have been provided without anyone billing the IDPA. As will be seen, to support the defendants' argument, there would have to be more free services provided than services actually billed.

Dr. Darling's Table 1 in his March 3, 2003 report shows of 112,512 children who should have received 6 well-child screening services, 58,794 received zero and 10,508 received one. Comparing the number of services that were provided to these children with the number of services that would have been billed had all 112,512 children in this age group received all 6 scheduled screenings shows that during the period of July 1, 1998 through December 31, 2001,

only approximately 170,000 out of a total of over 675,000 scheduled EPSDT services were received by children from 10 days to 11 months of age. This represents a shortfall of over 500,000 services.

Applying this analysis to the continuously Medicaid-eligible children through age 5 that Dr. Darling analyzed, IDPA records reflect approximately 330,000 services were given out of a total of more than 1.2 million services that should have been given. Thus, children under 5 received almost 900,000 fewer well-child examinations than called for by the Illinois periodicity schedule.

For the defendants to argue that the number of services listed above are provided somewhere by someone who does not bill the IDPA is sheer fantasy. There was absolutely no evidence brought forth corroborating such a theory and, quite simply, it strains the imagination to believe that this many services are provided for free by some provider the IDPA cannot even name. As defendants point out, even if the MMIS and Cornerstone data were underreported to a significant degree, the level of services provided to the plaintiffs is inadequate. The court finds defendants' arguments attacking their very own data which, once again, is submitted to the federal government as required by federal law, to be completely unpersuasive.

Defendants' reliance on Mr. Menenberg's critiques of Dr. Darling's methodology fares no better. Mr. Menenberg lodged a variety of attacks on the methodology of Dr. Darling, but all ultimately fail. First and foremost, Dr. Darling and Mr. Menenberg took two separate approaches, and Mr. Menenberg's analysis, as it relates to the provision of EPSDT services, is unhelpful. While Dr. Darling examined the medical services provided to the plaintiffs within certain age groups to assess whether EPSDT services have been provided on a timely basis, Mr.

Menenberg measured all services provided to the plaintiffs to measure whether children have access (not equal access) to services.[21] This did not address nor undercut Dr. Darling's analysis in any way. Mr. Menenberg himself conceded that he was not comparing his analysis to the Illinois periodicity schedule and that Dr. Darling's analysis "might" be helpful in that regard. (Menenberg Trial Tr. at 1306:3-9.)

Mr. Menenberg also attacked Dr. Darling's report and testimony in several other respects (many of which were introduced for the first time at trial). For example, Mr. Menenberg argued that Dr. Darling's methodology was flawed because Dr. Darling only addressed those children who were entirely within the studied age ranges during the Data Period.[22] Mr. Menenberg argued that because of this exclusion Dr. Darling did not consider anywhere between 660,000 and 742,000 services provided to the children.

Mr. Menenberg's critique, however, once again focused on looking at the total number of services provided. As plaintiffs have repeatedly pointed out, Dr. Darling's analyses examined something separate, that being the percentages of children who were receiving timely EPSDT

---

[21]Even assuming that Mr. Menenberg's analysis had relevance to the EPSDT provisions, which it does not, plaintiffs persuasively point out that Mr. Menenberg's results overstate the level of access to services. For example, Mr. Menenberg included every visit to a doctor, such as well-child visits, sick child visits and trips to the emergency room or to a "safety net" clinic for an acute condition. This is not relevant toward the question of whether children are able to obtain regular well-child care. Mr. Menenberg also excluded all children that became eligible for Medicaid prior to July 1, 1998, even though he admitted he had all of the encounter information for these children within the Data Period. As plaintiffs point out, under Mr. Menenberg's analysis the defendants' position in this case would be better if the average number of visits to doctors were as high as possible. By excluding children eligible before July 1, 1998, Mr. Menenberg's analysis by its nature includes every child that should have received seven exams during the Data Period and excludes virtually all of the children who should have received one. Thus, nearly all of the children that would increase the number of examinations were included in Mr. Menenberg's analysis while he eliminated those that would lower the number of exams.

[22]Plaintiffs presented the following example of Dr. Darling's exclusion. A child born March 1, 1998 would be excluded from Dr. Darling's analysis because that child was not both 10 days and 11 months old during the Data Period. Instead, the child would have been 4 months old at the start of the Data Period.

services in accordance with the periodicity schedule. If Dr. Darling were to have included these partial year increments, his analysis would have been inaccurate for showing the total number of services that were provided according to the Illinois periodicity schedule.[23] Mr. Menenberg and Dr. Darling took separate approaches and Mr. Menenberg's criticisms never fully account for what exactly Dr. Darling was attempting to show. As such, the court finds these criticisms unpersuasive.

Based on the entire record, the court finds that the plaintiffs have shown that they are not being provided EPSDT services under the defendants' State Plan and that the defendants are in violation of federal law. The IDPA has not established a Medicaid program designed to provide all EPSDT services to all Medicaid-enrolled children on a timely basis.

## CONCLUSION

For all of the reasons set forth above, the court declares that the defendants' policies and practices have violated and are violating the rights of the plaintiffs under 42 U.S.C. § 1396a(a)(30)(A) and the EPSDT provisions. This case will be called for status on September 14, 2004 at 9:30 a.m. to discuss further proceedings relating to an appropriate injunction to remedy the defendants' violations. Furthermore, the plaintiffs are awarded their

---

[23]If Dr. Darling had included these children in his analysis, the most services that a child born on March 1, 1998 could have received would have been three, even if the child had received all six scheduled services on a timely basis. Including such children would have understated the percentage of children receiving proper numbers of timely EPSDT services.

costs and reasonable attorneys' fees, the amount of which to be determined upon entry of final

judgment in accordance with Local Rule 54.3. It is so ordered.

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: August 23, 2004